AVIANCA, INC., Helicopteros Nacionales de Columbia, S.A., Sociedad Aeronautica de Medellin Consolidada, S.A., and North American Air Service Company, Inc., Plaintiffs,

v.

Mark F. CORRIEA, Martin J. Tierney, and Corriea & Tierney, Defendants.

Civ. A. No. 85–3277(RCL).

United States District Court, District of Columbia.

Feb. 6, 1989.

Gary E. Cross (argued), Dunaway & Cross, Washington, D.C. (Mac S. Dunaway and Kevin M. Rooney with him, on the briefs), for plaintiffs.

John H. Spellman (argued), Hamel & Park, Washington, D.C. (Robert F. Reklaitis and Maureen Duignan with him, on the briefs), for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

Plaintiffs Avianca, S.A., the major airline and flagship international carrier of the Republic of Colombia, and its related Colombian and United States companies and subsidiaries, brought this action against their former attorney, Mark Corriea, a District of Columbia licensed practitioner, and

his partner and law firm, for breach of fiduciary duty, fraudulent misrepresentation, and civil violations of Title IX of the Organized Crime Control Act of 1970, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* More particularly, plaintiffs allege that after having entered into an on-going attorney-client relationship with one or more of the plaintiff companies in 1980, for which defendants were paid over $1,000,-000.00 in legal fees over the next five years, defendants breached their ethical and fiduciary obligations to plaintiffs by, among other things, misappropriating client funds, acquiring and maintaining undisclosed financial interests in transactions involving plaintiffs, and secretly dealing with the then president of plaintiff Avianca, S.A. Plaintiffs seek a full accounting, disgorgement of all profits, and return of all attorneys fees paid over the five year period. Defendants first deny that there was an on-going, continuous attorney-client relationship, and instead characterize their services as "occasional." Defendants then categorically deny any breach of ethical or fiduciary duty which may have been owed to plaintiffs, and maintain that they acted with the full knowledge and tacit approval of plaintiffs. Finally, defendants counterclaim for libel and slander, interference with their prospective advantage, breach of contract, and indemnification. Jurisdiction for both the complaint and counterclaim is properly grounded in 28 U.S.C. § 1332(a)(3), there being complete diversity of citizenship between the parties.

The record in this case is extensive and complex, comprising several hundred docket entries, thousands of pages of court record, and nearly seventy motions. The case comes before this Court presently on eight motions and cross-motions, including plaintiffs' motion to compel production of documents, defendants' motion for reconsideration of the magistrate's order to produce documents, plaintiffs' motion to compel Andres Cornelissen to answer the amended complaint, defendants' motion for summary judgment on the complaint, defendants' motion for partial summary judgment on count 1 (defamation) of the counterclaim, plaintiffs' cross-motion for summary judgment on count 1 (breach of fiduciary duty) of the complaint, plaintiffs' cross-motion for summary judgment on count 1 (defamation) of the counterclaim, and plaintiffs' motion to compel defendant Corriea to answer interrogatories and produce documents with respect to his medical condition and financial statements.

## I. FACTS

Notwithstanding the legal morass created by the parties, most of the essential facts underlying this case are undisputed or beyond serious dispute. Where there is significant disagreement is in regard to the legal interpretation or appropriate characterization of these underlying facts.

### A. Parties

Plaintiff Aerovias Nacionales de Colombia, S.A. ("Avianca, S.A.") is a corporation organized and existing under the laws of the Republic of Colombia. It operates Avianca airlines, providing domestic and international service from Colombia. Plaintiff Avianca, Inc., is a New York corporation wholly owned by Avianca, S.A., and serves as the airline's general agent in the United States. Plaintiff Helicopteros Nacionales de Colombia, S.A. ("Helicol"), is a Colombian corporation operating a fleet of helicopters and fixed-wing aircraft in Colombia and other South American countries. Plaintiff Sociedad Aeronautica de Medellin Consolidada, S.A. ("SAM"), is a Colombian corporation providing domestic air service within Colombia. Avianca, S.A. is the majority shareholder of both Helicol and SAM. Plaintiff North American Air Service Company, Inc. ("Norasco"), is a Delaware corporation wholly owned by Avianca, Inc. Norasco was created to take advantage of a bilateral treaty provision, *Relief From Double Taxation on Earnings From Operation of Ships and Aircraft*, 12 U.S.T. 3141, T.I.A.S. No. 4916 (1961), which exempts Colombian withholding taxes of approximately 45%, and serves as a conduit for lease payments made by Avianca, S.A., Helicol, and SAM to aircraft lessors in the United States.

**670**

In late 1979, defendant Mark Corriea, while representing his then client-employer, Itel Air Corporation, in a sale-leaseback transaction with plaintiff Avianca, S.A., met plaintiff Avianca S.A.'s then executive vice president, Andres Cornelissen. Apparently impressed with Corriea's work in the transaction, in early 1980, Andres Cornelissen began seeking Corriea's legal services for Avianca, S.A. After briefly representing Avianca and Itel contemporaneously, Corriea left Itel to become a sole practitioner. In 1982, Corriea and defendant Martin J. Tierney formed the defendant law partnership of Corriea & Tierney, which continued to represent plaintiffs in aircraft leasing, corporate financing, and government relations matters until August 1985. Martin Tierney is a licensed attorney, practicing in California. Subsequent to meeting Corriea in 1979, Andres Cornelissen became the president of Avianca, S.A., and then, following a shareholder dispute in 1985, resigned. Cornelissen is a Colombian citizen, who was earlier joined as a party defendant in this case. During the discovery phase of the case, he was ordered to respond to deposition questions regarding his finances and foreign bank accounts by the United States District Court for the Southern District of Florida. Because of his refusal to fully respond, Cornelissen is currently subject to arrest under an outstanding bench warrant issued by that court.

### B. Attorney–Client Relationship and Breaches of Fiduciary Duty

By representing Avianca, S.A., and its related companies and subsidiaries, over a period of several years, Corriea, and later his law firm, certainly created and maintained an attorney-client relationship. Indeed, even defendants describe themselves as plaintiffs' "former counsel." Memorandum of Points and Authorities in Support of the Motion of Defendants–Counterplaintiffs for Summary Judgment (hereinafter "Defendants' Memorandum") at 1. Plaintiffs primarily rely on Corriea's undisputed actions in three transactions to demonstrate that Corriea breached his fiduciary duties of loyalty and full disclosure in his representation of plaintiffs.

#### 1. Use of Norasco Funds.

One of Corriea's earliest services for Avianca, S.A., was the creation of Norasco. Corriea, as Avianca's attorney, incorporated Norasco and agreed to serve as Norasco's president and attorney. Avianca gave Corriea $7,000 in January 1980 to cover the cost of Norasco's stock, as well as Corriea's legal fees and incurred expenses. Pursuant to Avianca's instructions, Corriea registered legal title to the Norasco stock in his name, but endorsed the shares over to Avianca, Inc., and sent the certificates to Avianca, S.A. Over the next two years, while president of and attorney for Norasco, Corriea admittedly issued or caused to be issued over $240,000.00 in checks payable to cash, himself, his law firm, and Fund Sources International, Inc. ("FSI"), a company wholly owned by Corriea. Corriea does not dispute that the funds were often used for his personal expenses, including repairs to a Rolls Royce automobile jointly owned by Corriea and Cornelissen, and typically used without the consent or knowledge of the plaintiffs; rather, Corriea insists that as president and sole shareholder of Norasco, he was entitled to "use corporate assets as he sees fit and may even appropriate those assets for his own use." Defendants' Memorandum at 25.

#### 2. American Aerospace, Limited.

Nearly a year after the creation of Norasco for Avianca, Corriea again incorporated a closely held company, this one an off-shore company for the sole benefit of Andres Cornelissen. The company, American Aerospace, Limited ("AAL"), was incorporated in Bermuda on August 3, 1981, with Corriea as its president, chairman and lawyer. Cornelissen, the sole beneficial owner, held no stock in his own name, nor a position in the company, and his connection with AAL was not disclosed to Avianca, S.A. until discovery in this case. AAL was only involved in one transaction prior to being dissolved in 1985. Soon after the creation of AAL, Cornelissen and Corriea, through FSI, arranged a lease of two Boeing 707 aircraft to Faucett Airlines, a Peru-

vian company, with aircraft maintenance to be provided by Avianca, S.A. Still not disclosing Cornelissen's interest in AAL, nor his own interest in FSI, when Faucett defaulted on the lease agreement a few months later, Corriea threatened Avianca, S.A. with litigation unless it returned some $149,000.00 in engine reserve funds it held in escrow for Faucett. Corriea claims that the documents involving AAL are covered by an attorney-client privilege between him and AAL, despite the fact that he was, for all intents and purposes, both the lawyer and the sole officer of the company.

### 3. Twin Otter Transaction.

At about the same time that Corriea and Cornelissen were negotiating the Faucett transaction on behalf of AAL and FSI, Helicol, a wholly owned subsidiary of Avianca, S.A., was negotiating the purchase of a Twin Otter aircraft from a Canadian aircraft company, DeHavilland. After verifying that Corriea could arrange lease financing for Helicol, Cornelissen instructed the general counsel of Helicol to contact Corriea for assistance in obtaining the Twin Otter aircraft. Corriea, acting as the president of FSI, sent Helicol a proposal for lease of a Twin Otter in November 1981. Subsequently, Corriea, again acting as the president of FSI, sought financing from Export Development Corporation ("EDC"), a Canadian investment firm. By March 1982, FSI was still unable to obtain the needed financing from EDC, and Helicol informed Corriea that it therefore intended to purchase the aircraft directly from DeHavilland. Corriea responded by telex, stating that FSI would not accept Helicol's withdrawal, and would consider that withdrawal a violation of the agreement, subjecting Helicol to liability for FSI's losses. That same day, unbeknownst to Helicol, or Avianca, Andres Cornelissen wired $247,000 into FSI's Chase Manhattan account.[1] Corriea admits using at least $130,000 of Cornelissen's loan to consummate the EDC financing transaction. FSI thereafter obtained two Twin Otter aircraft, and leased them to Norasco for sublease to Helicol. Corriea admits having represented both FSI and Norasco in the Twin Otter transaction, but denies having represented Helicol or Avianca, S.A. Further, he argues that he adequately and effectively disclosed his financial interest in FSI to Helicol prior to the transaction.

### C. Andres Cornelissen

Avianca, S.A.'s former president, Andres J. Cornelissen, has been a mysterious, silent party to this litigation for over two years, and has yet to appear before this Court personally or through counsel. The chronology of Cornelissen's role in this case dates back to plaintiffs' July 25, 1986, motion to join Cornelissen as an additional party and amend their complaint. Defendants opposed that motion, arguing that the Court lacked subject matter jurisdiction, there being neither diversity nor federal question jurisdiction, and that adding Cornelissen as a party defendant would unduly delay the trial to the prejudice of the then existing defendants. On August 8, 1986, the magistrate denied plaintiffs' motion to join Cornelissen. Thereafter, on August 15, 1986, plaintiffs moved the Court to reverse the magistrate's order, arguing that the Court had both diversity and federal question jurisdiction, and that by not allowing the joinder of Cornelissen, purportedly a co-conspirator of Corriea, the Court would cause great hardship and prejudice to plaintiffs and needlessly require duplicative lawsuits. Defendants again objected to the joinder, repeating their earlier argument, and adding that the Court lacked personal jurisdiction, that venue in the District of Columbia was inappropriate, and that the dispute between Avianca, S.A. and its former president was best left to Colombian courts. After a hearing on the matter, on August 25, 1986, the Court re-

---

1. Curiously, in his deposition, Corriea explained that he had requested a personal loan of $60,000 from Cornelissen, for use in the Faucett transaction, and had no idea why Cornelissen gratuitously included the additional $187,000. Cornelissen, on the other hand, explained that he loaned Corriea $247,000, in an undocumented, personal loan, without asking why Corriea wanted or needed the money. Until this litigation, the existence of the loan was not disclosed to plaintiffs, and no part of the principal or interest had been paid.

versed the magistrate's order, permitting plaintiffs to join Cornelissen and amend their complaint. In their amended complaint, plaintiffs alleged that Cornelissen (1) conspired with Corriea to breach Cornelissen's fiduciary duty as an officer of plaintiff Avianca, S.A., (2) fraudulently misrepresented or failed to disclose material facts in transactions involving plaintiffs and Corriea, and (3) committed civil violations of RICO as a co-conspirator of Corriea.

Following the Court's August 25, 1986 order, plaintiffs were utterly unsuccessful in their attempts to serve Cornelissen, a Colombian citizen and (apparently) frequent world traveller, personally. Nor were they successful in serving Cornelissen through his known District of Columbia contacts. On October 24, 1986, both Corriea and Cornelissen's District of Columbia counsel, Fulbright & Jaworski, objected to plaintiffs' attempts to serve process on Cornelissen through his attorneys. Specifically, Corriea argued that there was no provision for allowing service through another party defendant; that service through AAL, which once shared FSI's District of Columbia mailing address, was impossible, because AAL had been dissolved; and that RICO did not authorize service in a foreign country. Fulbright & Jaworski, appearing for the limited purpose of opposing service on Cornelissen through its firm, argued that such alternative service would impermissibly impede their attorney-client relationship with Cornelissen, and that alternative service under the Federal Rules was inappropriate in any event, because neither the D.C. long arm statute nor federal law authorized service under the facts of the case. On October 27, 1986, during a hearing on the matter, the defendants and intervenor conceded that they were not in a position to directly challenge the Court's exercise of personal jurisdiction over Cornelissen, because to do so would have admitted the very agency relationship with Cornelissen they each adamantly repudiated. While the Court agreed that service via a law firm was probably inappropriate, it ordered a further evidentiary hearing to determine the whereabouts of defendant Cornelissen in order to determine a more appropriate means of effecting service of process.

The evidentiary hearing was held on November 5, 1986, and the Court, after hearing testimony from defendant Corriea, found that Cornelissen was aware that he had been joined as a party defendant, and was actively avoiding service of process. In that hearing, Corriea testified that he had last met with Cornelissen in person during the summer of 1986 in the south of France, where Cornelissen was vacationing. Corriea had had frequent telephone conversations with Cornelissen since that meeting, and was keeping Cornelissen apprised of the developments in the case. Further contacts between Corriea and Cornelissen were likely, given their ongoing personal and financial relationships. For example, Corriea, on Cornelissen's request, sold their jointly-owned Rolls Royce, as well as Cornelissen's "small BMW," and sent Cornelissen's share of the proceeds to his estranged wife in California, where she lives with Cornelissen's three children. Furthermore, the law firm of Corriea & Tierney had been paying credit card and other bills for Corriea, and had bought an automobile for and transferred funds to Cornelissen's daughter, a student at Stanford University. Concluding that Cornelissen had ample notice of the proceedings against him, if not valid service of process, and certainly had been given an opportunity to protect his interests, the Court on November 24, 1986, authorized alternative service of process. Specifically, plaintiffs were directed to send the summons and complaint by certified mail to nine addresses within the United States and abroad, with which Corriea was likely to have contact. Having complied with the Court's order, but having received no response whatsoever from Cornelissen, plaintiffs now seek to compel Cornelissen to answer the amended complaint.

### D. Counterclaims of Defamation

During the month of August 1985, a number of events took place at Avianca, S.A., culminating in the later filing of the instant action and the resultant counter-

claims. Earlier that summer, Avianca had conducted an internal audit of its wholly owned American corporation, Norasco, and discovered that Corriea had made what Avianca considered unauthorized withdrawals amounting to some $240,000.00 from Norasco's account. Then, in early August, 1985, Avianca officials began to question the integrity and propriety of Corriea's handling of another matter involving Norasco, the Twin Otter lease transaction, and sought the opinion of an independent District of Columbia law firm, Holland & Knight, with a view towards possible litigation against Corriea. In mid–August, in the midst of a shareholder dispute, Avianca's president, Andres Cornelissen resigned. On August 19, 1985, Avianca terminated the services of Corriea and his law firm. Immediately prior to the termination, Avianca officials had met with William Bell, of Holland & Knight, to seek his opinion regarding the propriety of Corriea's multiple roles in the Twin Otter transaction. Mr. Bell rendered an opinion letter, which concluded that Corriea's multiple roles in the Twin Otter transaction, serving as counsel for Avianca and Norasco and as a principal for FSI, was on its face a breach of his ethical obligations, *unless* he made a "complete and full disclosure of all facts and circumstances ... to Avianca, and ... Avianca at an appropriate level of management, agreed to his actions." Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion for Partial Summary Judgment and in Support of Plaintiffs' Cross–Motion for Summary Judgment as to Count 1 of Defendants' Counterclaims, Appendix at 210 (hereinafter referred to as the "Holland & Knight opinion letter"). Mr. Bell's letter was sent to the acting president of Avianca, who circulated it among the Board of Directors and General Counsel for Avianca. Within a matter of weeks, Avianca brought this action against its former counsel. Defendants' counterclaims of defamation also have their genesis in the Holland & Knight opinion letter.

Defendants' counterclaims of defamation are based on two separate publications of allegedly false and defamatory statements about defendant Corriea and his law firm. First, on September 8, 1985, five weeks prior to the beginning of the instant action, *El Tiempo*, a major Colombian newspaper, ran an article describing the internal strife at Avianca. In writing the article, the paper interviewed both Avianca's acting president, Hernando Castilla Samper, and Mark Corriea. The article noted that Avianca had "contracted ... the services of a law firm to study the judicial conduct of Corriea in the leasing of the airplanes for Helicol," and that according to that law firm, Corriea's multiple roles in the transaction could be sanctionable conduct "unless Corriea can prove that he informed Avianca about the business deal and that Avianca approved it." Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion for Partial Summary Judgment and in Support of Plaintiffs' Cross–Motion for Summary Judgment as to Count 1 of Defendants' Counterclaims, Appendix at 215 (hereinafter referred to as the "*El Tiempo* article"). Nowhere in the article is the actual Holland & Knight opinion letter quoted, although defendants insist that the letter itself was "leaked" to the press, and that plaintiffs therefore negligently allowed publication of the purportedly defamatory statements in the letter. Memorandum of Points and Authorities in Support of the Motion of Defendants–Counterplaintiffs for Partial Summary Judgment at 10. Finally, it is worth noting that the article was balanced inasmuch as it gave Corriea equal time in disputing Avianca's allegations and in making counter-allegations.

The second allegedly defamatory act occurred some three months after the filing of the instant action, in January 1986, when Edgar Lenis, then president of both Avianca, Inc. and Norasco, was interviewed for a live broadcast on a Colombian radio station. During the course of that interview, which was subsequently reported in the following day's *El Tiempo*, Mr. Lenis noted that Avianca had filed suit against Corriea, and essentially repeated the various allegations in the complaint. Specifically, Lenis accused Corriea of making unauthorized

withdrawals from Norasco accounts and of violating his ethical obligations in connection with the Twin Otter transaction. Memorandum of Points and Authorities in Support of the Motion of Defendants–Counterplaintiffs' for Partial Summary Judgment at 11.

Significantly, plaintiffs do not dispute that any of the above statements about Corriea were made. Rather, the dispute lies in the truth of those assertions, and which, if any, of them are properly considered defamatory. Defendants' counterclaims are, of course, premised on the argument that the statements were defamatory, and that plaintiffs, either by design or negligence, caused those statements to be published, to the professional harm of defendants.

## II. DISCUSSION

### A. Discovery Motions

1. Plaintiffs' Motion to Compel Production of American Aerospace, Limited (AAL) Documents and Defendants' Motion for Reconsideration of the Magistrate's Order to Produce Aradyne Documents.

Of the eight pending motions and cross-motions currently before the Court, plaintiffs' motion to compel production of AAL documents, and defendants' motion for reconsideration of the magistrate's order to produce Aradyne documents, are the most procedurally convoluted and intricate.

### a. American Aerospace, Limited (AAL) Documents.

On June 27, 1986, plaintiffs served their second set of interrogatories and second request for production of documents on defendant Corriea. Both of the requests focused on Corriea's corporate interests and affiliations, including, specifically, American Aerospace, Limited—the offshore, Bermuda corporation he formed for the benefit of Cornelissen—and its wholly owned Bermuda subsidiary, Aradyne Limited. Aradyne Limited shares the same structure as AAL; that is, 100% beneficial ownership by Cornelissen with Corriea serving as President and Chairman of the Board. Aradyne Limited was formed at the behest of another corporation with connections to Corriea, Aradyne Corporation of Nevada. In response to plaintiffs' second set of interrogatories, Corriea refused to divulge the names of his corporate affiliations, claiming they were completely unconnected with this case. To the second request for production of documents, Corriea withheld seventy-two documents ("AAL documents"), with respect to which he claimed an attorney-client privilege. Specifically, Corriea claimed that "these documents relate to legal services performed for or on behalf of AAL by Mark F. Corriea, Corriea & Tierney, or Appleby, Spurling & Kempe, AAL's counsel in Bermuda." Defendants' Response to Plaintiffs' Second Document Request. On August 8, 1986, plaintiffs moved to compel Corriea to answer the second set of interrogatories and produce documents related to his response. Magistrate Attridge, on September 10, 1986, granted plaintiffs' motion, and directed Corriea to "file full and responsive answers to plaintiffs' second set of interrogatories ... and produce documents identified in or connected with his responses to the aforesaid interrogatories which relate to any and all subsidiaries, divisions or affilitates [sic] of American Aerospace, Ltd., Aradyne–Limited and Aradyne–Inc." Then on October 16, 1986, plaintiffs moved to compel production of the seventy-two AAL documents withheld in response to their second request for production of documents, to wit, the AAL documents relating to the corporation's single business transaction prior to its dissolution in 1985, the lease of a Boeing 707 to Faucett and accompanying maintenance agreement with Avianca. Plaintiffs argued that defendants had failed to meet their burden of establishing that an attorney-client privilege protected the documents from discovery, reasoning that because there was no attorney-client relationship between Corriea, AAL's president and chairman as well as attorney, and Cornelissen, the 100% beneficial owner of the corporation, there could be no valid privilege. Nor, plaintiffs further argued, could busi-

ness partners ever claim to share a privileged relationship simply because one of them is licensed to practice law. In response, defendants released, without explanation, fifteen of the previously withheld documents, but argued that, contrary to plaintiffs' misconstrual of the asserted privilege, the remainder were all covered by an attorney-client privilege between Corriea and the corporate body of AAL, rather than between Corriea and Cornelissen. In their repiffs continued to argue that there could be no valid privilege, asserting, without any cited authority, that "since a corporation acts only through human beings, the Court must first identify the human being who has instructed defendants to assert their present claim." Reply to Defendants' Opposition to Plaintiffs' Motion to Compel Production of Documents at 1. On November 7, 1986, Magistrate Attridge ordered the disputed documents submitted for *in camera* review. Thereafter, defendants submitted twenty-five documents, but turned over thirty-five others to plaintiffs without any further objection to their discovery. On December 1, 1986, Magistrate Attridge granted plaintiffs' motion with respect to some, but not all, of the AAL documents that had been submitted. Subsequent to that December 1, 1986 order, defendants submitted still more AAL documents for *in camera* review. The magistrate did not yet make a ruling with respect to these most recently submitted documents.

### b. *Aradyne Corporation and Aradyne, Limited Documents.*

In a July 2, 1987 hearing, defendants requested reconsideration of the magistrate's order requiring production of Aradyne Corporation and Aradyne, Limited documents (hereinafter collectively referred to as "Aradyne documents"), arguing that the documents exceeded the scope of permissible discovery in that they were unrelated to the instant litigation. At the end of the July 2, 1987 hearing, the Court orally referred the matter back to the magistrate for a determination as to the relevance of the documents sought. On August 11, 1987, after a hearing on the matter, Magistrate Attridge ordered defendants to submit a *Vaughn* index of all the contested Aradyne documents. The following week, on August 17, 1987, defendants submitted the required *Vaughn* index, reasserting their argument that the documents had "no relevance to any of the issues or claims in this litigation and are not reasonably calculated to lead to the discovery of admissible evidence." Moreover, defendants asserted, "some of the documents constitute attorney-client privileged communications and should be protected from discovery on that additional ground." Notice of Filing, at 1–2. The magistrate did not yet make a ruling with a ruling with respect to any of the documents listed in defendants' *Vaughn* index.

### c. *Attorney–Client Privilege.*

Defendants' standing objection to release of the remaining AAL documents as well as their alternative argument against release of several specified Aradyne documents is that the documents are protected by an attorney-client privilege between Corriea and his corporate clients, AAL and Aradyne.

In the ordinary course of litigation, attorney-client communications are considered privileged and are protected from discovery. Fed.R.Civ.P. 26(b). However, the privilege is neither absolute nor broadly construed. Rather, as this circuit has held, the privilege is strictly construed, and the party asserting it bears the burden of proving its existence. *Underwater Storage, Inc. v. United States Rubber Co.*, 314 F.Supp. 546, 547–48 (D.D.C.1970). The existence of an attorney-client privilege with respect to corporations has long been recognized, albeit not always clearly defined. *See United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 359 (D.C.Mass. 1950) (allowed privilege where in-house, corporate counsel was giving legal advice rather than acting as business advisers of the corporation). While the courts have differed in the corporate "persona" they recognize as able to claim the privilege, employing either the overly restrictive

"control group" test ultimately rejected by the Supreme Court in *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), or some variant of the "subject matter" test first articulated in *Harper & Row Publishers, Inc. v. Decker*, 423 F.2d 487, 491–92 (7th Cir.1970) ("an employee of a corporation, though not a member of its control group, is sufficiently identified with the corporation so that his communication to the corporation's attorney is privileged where the employee makes the communication at the direction of his superior in the corporation and where the subject matter upon which the attorney's advice is sought by the corporation and dealt with in the communication is the performance by the employee of the duties of his employment"), and refined in *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 602 (8th Cir.1977) (attorney must give *legal* advice, not business advice), the courts have consistently limited the privilege to communications treated as confidential by the parties, and more significantly, communications with an attorney, acting in his professional legal capacity, "for the express purpose of securing legal advice." *SEC v. Gulf & Western Industries, Inc.*, 518 F.Supp. 675, 681–83 (D.D.C. 1981). Where the communication is with in-house counsel for a corporation, particularly where that counsel also serves a business function, the corporation must clearly demonstrate that the advice to be protected was given "in a professional legal capacity." *In re Sealed Case*, 737 F.2d 94, 99 (D.C.Cir.1984) (citing with approval, *SEC v. Gulf & Western*, 518 F.Supp. at 683). This limitation is necessary to prevent corporations from shielding their business transactions from discovery simply by funneling their communications through a licensed attorney. *Cf.*, Simon, "The Attorney-Client Privilege as Applied to Corporations," 65 *Yale L.J.* 1953 (1956) (warning of the creation of "zones of silence").

■ Plaintiffs correctly note, insofar as the AAL documents are concerned, that defendants have not attempted to identify the corporate persona, or "human being," behind the claimed privilege. Indeed, as plaintiffs further point out, the list of candidates is extremely short, given that defendants themselves have conceded the exclusion of Cornelissen, and the sole remaining persons in the corporate structure are Corriea and the Bermuda law firm of Appleby, Spurling & Kempe, which administered the corporation on Corriea's behalf. Moreover, defendants have made no showing that any of the communications were for the express purpose of seeking legal advice, nor that Corriea was acting in a purely professional, as opposed to business, capacity. Finally, defendants' claim of an attorney-client privilege for specified Aradyne documents fails for the same reasons —there simply is no showing that the communications were for the express purpose of seeking legal, and not business, advice.

#### d. Relevance.

■ Defendants' argument that the Aradyne documents are irrelevant is similarly unavailing. Relevancy under the Rule 26, Fed.R.Civ.P. 26, is very broadly defined, including both directly relevant material and material likely to lead to the discovery of admissible evidence, *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978) (Rule 26(b)(1) "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."); *United States v. American Telephone & Telegraph*, 461 F.Supp. 1314, 1341 n. 81 (D.D.C.1978) ("The clear policy of the rules is toward full disclosure ... [I]t is rare that a particular item of requested information is not 'relevant' under the broad definition given that word in Rule 26.") (quoting Judge Kaufman, Judicial Control Over Discovery, 28 F.R.D. 111, 119 (1961)); 8 Wright & Miller, *Civil* §§ 2008, 2009. The facts of this case as they have become apparent since the magistrate's order, including the joinder of Andres Cornelissen as a party defendant, and the evidence of conflicts of interest involving Corriea and his corporate affiliations, clearly demonstrate the relevancy of all of the documents sought.

In sum, the Court finds no valid attorney-client privilege protecting any of the AAL documents 800495 through 800699 inclusive, nor any of the Aradyne documents listed in defendants' *Vaughn* index. Furthermore, the Court finds all of the Aradyne documents in the *Vaughn* index relevant, within the broad scope of Federal rule 26(b).

2. Plaintiffs' Motion to Compel Corriea to Answer Interrogatories and Produce Documents With Respect to His Medical Condition and Financial Statements.

On September 4, 1987, plaintiffs moved to compel responses to interrogatory questions 3, 4, 8, and 9 of their fourth set of interrogatories and requests 3 and 4 of their fifth request for production of documents. These discovery requests generally sought information regarding defendant Corriea's medical history, credit applications, and financial statements. Defendants objected to the release of the information, arguing that the requests were "irrelevant to the matters at issue in this litigation, clearly excessive in scope, and designed merely to harass Mr. Corriea." Defendants' Opposition to Plaintiffs' Motion to Compel at 1. In reply, plaintiffs argue that Corriea put his medical condition in issue by claiming that the stress arising from the lawsuit and concomitant injuries to his reputation resulting from plaintiffs' allegedly defamatory statements aggravated his preexisting gastrointestinal problems. Further, plaintiffs argue, defendant Corriea's personal financial records are "critically relevant" to their case to track the proceeds and defendants' characterization of the personal "loan" of $247,-000.00 from Cornelissen to Corriea, as well as the path of funds improperly withdrawn from Norasco's account by Corriea. Finally, plaintiffs conclude, Corriea himself waived what privacy interests he had in his personal financial records by improperly commingling personal, professional, and business finances.

Subsequent to plaintiffs' motion to compel, this Court approved an order drafted by both parties, directing Corriea to arrange for his personal accountant to cull through Corriea's bank records—including statements, cancelled checks, wire transfers, and credit/debit memoranda—covering the period January 1, 1980 through January 1, 1987, in order to prepare a report classifying all of Corriea's transactions over the period into those related to the entities or persons named in the complaint and those which either were not related or could not adequately be classified. At the same time, the Court approved a stipulation between the parties to protect the confidentiality of medical records submitted in response to questions 1 through 7, inclusive, of plaintiffs' fourth set of interrogatories and fifth request for production of documents. Pursuant to the Court's first order, on March 2, 1988, defendants filed the report of Corriea's accountant.

 As discussed above, relevancy under the Federal Rules is very broadly defined. *Supra* at 676. Nonetheless, it is not unlimited, and may not unnecessarily intrude into the private matters of the parties. Because of the Court's holding dismissing defendants' counterclaims of defamation, Corriea's medical condition no longer appears relevant to any issue of the case, and does not otherwise fall within the broad gamut of discovery. The requested financial information, on the other hand, is patently relevant, particularly given the Court's findings with respect to Corriea's commingling and misappropriation of client funds.

### B. Motions for Summary Judgment
#### 1. The Complaint.

Defendants seek summary judgment on each of the three counts of plaintiffs' complaint—breach of fiduciary duty, fraudulent misrepresentation, and civil violations of RICO—arguing in each instance that plaintiffs have failed to establish evidence sufficient to support the essential elements of the respective claims. Plaintiffs, on the other hand, while opposing defendants' motion, have limited their cross-motion for summary judgment to count 1 of their complaint, breach of fiduciary duty. Plaintiffs'

and defendants' recitation of the facts and controlling law are strikingly similar. Indeed, the essential facts are undisputed, notwithstanding the coloration given them by the parties. Where plaintiffs and defendants part company most dramatically is in the legal effect of the facts presented. Hence, despite the complexity of the record, the case nonetheless is quite susceptible, in major parts, to summary judgment.

Federal Rule of Civil Procedure 56(e) provides, *inter alia*, that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party ... must set forth specific facts showing there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." Fed.R.Civ.P. 56(e). The Advisory Committee notes that the "very mission of the summary judgment procedures is to pierce the pleadings and to assess the proof to see whether there is a genuine need for trial." Fed.R.Civ.P. 56(e), Advisory Committee Note. Three Supreme Court cases decided in 1986 confirm this view, and highlight the usefulness of Rule 56(e) in disposing of cases, or parts of cases, that need not go to a jury. *See generally, Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (court should not send case to jury "unless evidence is of such a character that it would warrant a jury in finding a verdict in favor of that party"); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–89, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986) ("Where record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."). Finally, the Federal Rules envision partial summary judgment in those cases, as here, where some, but not all, of the issues may properly be disposed of before trial. Fed.R.Civ.P. 56(a), (d).

### a. Breach of Fiduciary Duty.

■] Because this case comes within the Court's diversity jurisdiction, it must look to the substantive law of the District of Columbia in analyzing plaintiffs' claim of breach of common law fiduciary duty. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Although the civil cause of action for disgorgement of attorneys fees and profits springs from the common law fiduciary and ethical obligations owed a client by an attorney, "[w]hether or not a breach of those obligations has occurred may be determined by resort to the standards set forth in the [American Bar Association Code of Professional Responsibility] Disciplinary Rules." *Financial General Bankshares, Inc. v. Lance*, 523 F.Supp. 744, 762 (1981), *vacated on jurisdictional grounds sub nom, Financial General Bankshares, Inc. v. Metzger*, 680 F.2d 768 (1982) (hereinafter referred to as *"Financial General II"*). Notably, the Circuit Court of Appeals for the District of Columbia vacated the holding of the District Court in *Financial General Bankshares*, concluding that the lower court had "abused its discretion" in retaining pendent jurisdiction, having already dismissed the sole federal law claim, over "novel and difficult issues of local law." *Financial General II*, 680 F.2d at 772. The Circuit Court, while expressly declining to reach the merits of the case, criticized the lower court's use of the Code of Professional Responsibility's Disciplinary Rules as a benchmark for delineation of the common law fiduciary obligations imposed upon attorneys, when the "courts of the District of Columbia have not had the opportunity to define the relationship between the Code" and those common law fiduciary obligations. *Id.*, at 771. However, unlike the situation in *Financial General I*, here the Court's jurisdiction is not discretionary. On the other hand, the questions of local law involved continue to be just as "novel and difficult," because the courts of the District of Columbia have

still "not had the opportunity to define the relationship between the Code and the common law fiduciary obligations imposed upon attorneys," *Financial General II,* 680 F.2d at 771, although the District of Columbia Court of Appeals in a related context has cited with approval the holding in *Financial General I, International Tours & Travel, Inc. v. Khalil, et. al.,* 491 A.2d 1149, 1155 (D.C.App.1985). Hence, the issue confronting Judge Gasch in *Financial General I* is now squarely before this Court, and this Court finds persuasive and concurs in the rationale of Judge Gasch's since-vacated opinion. The Disciplinary Rules (DR) of the American Bar Association's Code of Professional Responsibility, which have been adopted by both the District of Columbia Court of Appeals and the United States District Court for the District of Columbia, D.C.Ct.App. Bar Rules X; U.S. Dist.Ct.D.C.R. 4–3(IV), while not strictly providing a basis for a civil action, nonetheless may be considered to define the minimum level of professional conduct required of an attorney, such that a violation of one of the DRs is conclusive evidence of a breach of the attorney's common law fiduciary obligations. *Financial General I,* 523 F.Supp. at 762–63.

■ Plaintiffs correctly note that in order to prevail on their limited cross-motion for summary judgment, it is enough to show, as a matter of law, that defendants' conduct on one or more occasions or in one or more transactions breached a fiduciary obligation owed plaintiffs. That is, plain-tiffs do not seek a complete resolution of their claims, but are simply attempting to narrow the issues for trial. Understandably, therefore, plaintiffs do not attempt to prove every instance of alleged improper conduct, nor do they attempt to quantify their damages. Hence, the Court's Memorandum Opinion is limited to the narrow issue of whether plaintiffs have sufficiently demonstrated three particular breaches of fiduciary duty, and leaves open the issue of what measure of damages, if any, would be appropriate.

■ The Disciplinary Rules implicated in the three transactions upon which plaintiffs primarily rely are DR 5–101 [2] and 5–105 [3], which together preclude an attorney from accepting or continuing employment in situations where his professional judgment and loyalty to a client may be compromised. Neither of the rules is an absolute ban; rather, each provides an exception, allowing the attorney to accept or continue potentially conflicting employment, *providing* the attorney first affirmatively makes a full disclosure "of all the facts, legal implications, possible effects, and other circumstances relating to the proposed representation," and thereafter gains the informed consent of his client. *Financial General I,* 523 F.Supp. at 771; *Matter of James,* 452 A.2d 163, 176 (D.C.App.1982), *cert. denied,* 460 U.S. 1038, 103 S.Ct. 1429, 75 L.Ed.2d 789 (1983) (" 'Full disclosure' includes a clear explanation of the differing interests involved ... and the advantage of seeking independent legal advice. It also

---

**2.** Disciplinary Rule 5–101(A) provides:
Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.
ABA Code of Professional Responsibility, DR 5–101(A).

**3.** Disciplinary Rule 5–105 provides:
(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).
(C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.
ABA Code of Professional Responsibility, DR 5–105.

requires a detailed explanation of the risks and disadvantages to the client … including any liabilities that will or may forseeably accrue to him."). Where an attorney takes a position that is actually or potentially adverse to his client, the burden is on the attorney to show that he made a full, affirmative disclosure and acted with the utmost good faith. *Fielding v. Brebbia,* 399 F.2d 1003, 1005 (D.C.Cir.1968) (Because attorney-client relationship provides easy opportunity for attorney to take unfair advantage of client, attorney must prove good faith rather than client proving lack of good faith.), *quoting, Goodrum v. Clement,* 277 F. 586, 591 (D.C.Cir.1922).

Applying these standards to defendants' conduct in each of the three transactions discussed above, it is readily apparent that defendant Corriea allowed his professional judgment on behalf of his clients to be adversely affected by acquiring and maintaining interests potentially or actually in conflict with those of his clients. Furthermore, Corriea has not adduced any evidence of an *affirmative,* much less *full,* disclosure.

### (i) Twin Otter Transaction.

■■■■ Defendants' depiction of the elements essential for plaintiffs to prevail on their claim concerning Corriea's involvement in the Twin Otter transaction is at once too specific and too simplistic. First, defendants cannot discount Corriea's continuing fiduciary obligations to plaintiffs simply because he was not specifically or expressly retained as legal counsel in the Twin Otter transaction. *Financial General I,* 523 F.Supp. at 769 ("The duty of undivided loyalty requires a lawyer not only to advance the principal matter for which he was retained, but also to protect his clients' interests in all other respects."). The fiduciary duties owed plaintiffs by Corriea extended to all matters in which he was involved, not simply the ones for which

he received legal fees. Second, defendants' suggestion that because Corriea openly signed correspondence to plaintiffs as the president of FSI—thereby implicitly putting plaintiffs on notice that he had a financial interest in the transaction—he somehow constructively met his burden of full disclosure borders on the ridiculous. The "disclosure" was neither affirmative nor anywhere near full within the meaning of the Disciplinary Rules. For example, there was no disclosure whatsoever regarding the material fact that FSI's financing for the transaction came from a personal, unsecured loan from a high-ranking officer of the corporation, the same officer who insisted Helicol solicit a proposal from FSI. Nor was there any disclosure of the other material financial aspects of the transaction, including substantial loans to Corriea from two business associates of plaintiffs with whom plaintiffs had active lease agreements. Finally, as plaintiffs correctly note, the burden is on the defendants to demonstrate that full, affirmative disclosure was made and that they acted with the informed consent of their clients. Defendants indisputably neither made nor attempted to make any affirmative disclosure, and thus obviously cannot meet their burden.

### (ii) American Aerospace, Limited.

■■■■ Defendants' representation of American Aerospace, Limited was as egregious and patent a breach of fiduciary duty as their representation of FSI in the Twin Otter transaction. The conflicts inherent in the dual representation are obvious: Corriea was simultaneously representing a corporate client [4] and a company owned by that client's highest ranking officer, when both companies were involved in the same industry and would likely compete for business opportunities with the same third parties. Not only did this multiple representation present a potential conflict of interest,

---

**4.** A corporate attorney's "client" is the corporate entity, and not individual officers or directors. While ethical conflicts and obligations in the corporate world are often murky, here the interests of Cornelissen, an officer of the corporation, were "clearly and directly antithetical to those of the" corporate client, and Corriea was ethically obligated to "both dissociate himself from and actively oppose" Cornelissen's activities. "Developments in the Law—Conflicts of Interest in the Legal Profession," 94 *Harv.L.Rev.* 1244, 1342–44 (1981).

but when the two clients' interests actually did collide, Corriea sided with AAL and his own FSI, threatening litigation against his client, Avianca. At no time did Corriea make or attempt to make a full disclosure, much less seek Avianca's consent to the dual representation.

### (iii) Norasco.

■ Defendants' arguments with respect to Corriea's undisputed withdrawals from Norasco's account are also completely untenable. Norasco was a shell company set up for the sole benefit of, and completely funded by, Avianca, S.A. Corriea's reliance on cases involving sole shareholders of corporations is misplaced. Corriea could not, in any meaningful sense, be considered the "owner" of Norasco. Instead, he was a trustee for Norasco, who ensured that the lease payments plaintiffs made to American firms were properly funnelled through Norasco. In fact, the financial statements and income tax returns of Norasco, which defendants attach to their brief confirm this fact: the corporation had no retained earnings; all payments in went back out. Furthermore, Corriea was not paid a salary for serving as Norasco's president and chairman. Rather, he was paid legal fees by Avianca. Hence, Corriea's misappropriation of $240,000.00 was patently a breach of his fiduciary duties of good faith, honesty, and full disclosure. The case of *United States v. Orsinger*, 428 F.2d 1105 (D.C.Cir.), *cert denied*, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 61 (1970), is instructive in this regard. In finding sufficient evidence for a jury to convict an attorney for larceny after trust, because he used trust funds for a self loan, the court held that

> [i]f the appellant was to receive the sisters' money as a loan, then as their lawyer he was bound to make full disclosure to them. It is elementary that the relationship between an attorney and his client, being one of the highest trust and confidence, requires the attorney to act in the utmost good faith and candor, and to be completely fair and frank with the

client, and to take no advantage of the confidence reposed in him.

428 F.2d at 1114.

### (iv) Conclusions of Law.

■ In sum, the Court finds, as a matter of law, that defendant Corriea breached his common law fiduciary duties owed plaintiffs by virtue of his on-going, continuous attorney-client relationship with plaintiffs in the following particulars: First, in the purchase and lease of two Twin Otter aircraft, Corriea breached his fiduciary duty of undivided loyalty by failing to make an affirmative disclosure to plaintiffs of all material facts, legal implications, and potential conflicts, or gaining the informed consent of plaintiffs prior to acquiring and maintaining interests affecting the business of plaintiffs, entering into a business transaction with plaintiffs in which defendants stood to gain profit, and acting as attorney for plaintiffs where defendants' financial, business, property, or personal interests were or reasonably could have impaired the exercise of Corriea's independent, professional judgment for the protection and benefit of the plaintiffs. Specifically, the Court finds that defendant Corriea had an affirmative duty to make full disclosure to the plaintiffs in their corporate capacities, and not merely to selected officers of the corporation. Thus, disclosure to Andres Cornelissen, then Executive Vice President of Avianca, S.A., was insufficient to meet the duty of full disclosure. Further, Corriea had a continuing affirmative duty to disclose all material facts, including not only the fact that he was the president of Fund Sources, Inc., but also that financing for the aircraft was supplied by an unsecured, personal loan or grant from Andres Cornelissen; that Corriea and Cornelissen had financial, business, property, and personal interests in common, and that Cornelissen's selection of Fund Sources, Inc., to complete the Twin Otter transaction was therefor not impartial; that Corriea's representation of plaintiffs in the Twin Otter transaction could be adversely affected by his financial, business, and property interests in his corporation, FSI; that other corporations may have

been more established and financially able to carry out the complex financing arrangements than the newly created FSI; and that FSI obtained substantial loans used to complete the transaction from competitors of plaintiffs, which could similarly adversely impact Corriea's professional judgment on behalf of plaintiffs. Second, in the creation and representation of American Aerospace, Limited for Andres Cornelissen, Corriea again breached his duty of undivided loyalty by failing to make an affirmative disclosure to plaintiffs of all material facts, legal implications, and potential conflicts, and by failing to gain the informed consent of plaintiffs prior to acquiring and continuing this patently conflicting dual representation. Third, defendant Corriea, again without making an affirmative, full disclosure or gaining the informed consent of plaintiffs, improperly commingled and appropriated to his own use funds and property of plaintiffs that were entrusted to him in his professional fiduciary capacity. Specifically, the Court finds that Corriea misappropriated for his own use $240,000.00 in Norasco funds.

### (v) Other Alleged Breaches.

■■■ While plaintiffs do not need to demonstrate every other instance of alleged improper conduct to prevail on their limited cross-motion for summary judgment, they do need to "set forth specific facts showing there is a genuine issue for trial" on each of their allegations in order to survive defendants' motion for summary judgment. Fed.R.Civ.P. 56(e).

Defendants argue that plaintiffs' "most reckless charge" is that defendant Corriea and his law firm received undisclosed commissions from twenty-eight named companies. Proving receipt of secret commissions is an understandably difficult task, particularly where the alleged recipient, in this case defendant Corriea, consistently refuses to disclose the very financial records most likely to contain the proof needed. Nonetheless, plaintiff has established some proof to support its allegation. Although plaintiffs' evidence, a letter to Corriea suggesting he could receive legal and other fees in a particular transaction,

is not yet sufficient to survive defendants' motion for summary judgment with respect to the allegation undisclosed commissions, neither have plaintiffs yet been afforded adequate discovery in this area. For that reason, summary judgment in defendants' favor is inappropriate.

### b. Fraudulent Misrepresentation.

■■■ Defendants do not address the claim of fraudulent misrepresentation in either their memorandum of points and authorities in support of summary judgment on the complaint or their reply to plaintiffs' memorandum in opposition. Thus, because defendants failed to show which of the elements of common law fraudulent misrepresentation plaintiffs have insufficiently demonstrated, their motion for summary judgment is not properly "made and supported as provided in" Rule 56(e).

### c. Civil Violations of RICO.

The Court finds sufficient evidence on each element of plaintiffs' civil RICO claim to agree that there is a genuine need for trial. Hence, summary judgment for defendants' on that issue is similarly inappropriate.

### 2. The Counterclaims.

### a. Defendants' Motion for Summary Judgment on Their Counterclaims of Defamation.

■■■ As defendants correctly note in their scholarly Memorandum of Points and Authorities, they bear the burden of establishing four essential elements to prevail on their counterclaims of defamation:

(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting at least to negligence on the part of the publisher; and

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

Memorandum of Points and Authorities in Support of the Motion of Defendants–Counterplaintiffs for Partial Summary

Judgment at 13 (citing *Restatement (Second) of Torts,* § 558 (1977); *Afro–American Publishing Co. v. Jaffee,* 366 F.2d 649 (D.C.Cir.1966); *Grossman v. Goemans,* 631 F.Supp. 972 (D.D.C..1986)). While defendants' memorandum gives an excellent recitation of the law of defamation, the record simply does not support the facts necessary for them to prevail. Fatally, defendants have not shown that the complained of statements were false. Indeed, as further discussed below, plaintiffs have demonstrated that the allegedly defamatory statements were substantially true. Hence, summary judgment on defendants' motion would clearly be inappropriate.

### b. *Plaintiffs' Cross–Motion for Summary Judgment as to Count I of Defendants' Counterclaims.*

■■■ Just as defendants must demonstrate that the statements alleged to be defamatory were in fact false, so too are plaintiffs absolved of liability by demonstrating that the statements were true. Truth is, in other words, an absolute defense to an action for defamation. *Olinger v. American Savings and Loan Association,* 409 F.2d 142, 144 (D.C.Cir.1969). However, plaintiffs need show only that the statements made were substantially true such that "the resulting harm would have been the same whether the minor misstatements had been included or not." *Herman v. Labor Cooperative Educational and Publishing Society,* 139 F.Supp. 35, 37–38 (D.D.C.1956). Plaintiffs argue, and the Court agrees, that both of the alleged defamatory statements were substantially true within the meaning of *Herman.*

■■■ The publication in *El Tiempo* of the conclusions drawn in Holland & Knight's opinion letter, was not, as defendants argue, false and defamatory. To begin with, the article, as well as the letter itself, essentially stated that Corriea's participation in the Twin Otter transaction was a sanctionable breach of legal ethics, unless he could establish his full disclosure to and the informed consent of plaintiffs. That statement is not only a fairly accurate rendition of the American Bar Association Code of Professional Responsibility, Disci-

plinary Rule 5–105, but it ultimately proved factually correct as well. Corriea *did* play multiple, potentially, if not actually, conflicting roles in the Twin Otter transaction. Corriea had an ongoing attorney-client relationship with Avianca and its affiliates, including Norasco, and was properly characterized as "Avianca's attorney," whether specifically retained and paid for legal advice in the Twin Otter transaction or not. Corriea also acted as a principal, as president of FSI, in what could be described as an arms length transaction with plaintiffs. Moreover, he did not make a disclosure to, nor seek the informed consent of, Avianca at an appropriate level within the corporation. Thus, while the Holland & Knight opinion letter and *El Tiempo* article were couched in hypothetical terms, in actuality Corriea patently breached his ethical obligations to plaintiffs, and his conduct *is* sanctionable under Disciplinary Rule 5–105.

■■■ Edgar Lenis' statements, made during a live interview on a Colombian radio station, were similarly not false or defamatory. In the interview, the English translation of which appears at Plaintiffs' Appendix pages 220–25, Lenis accused Corriea of making unauthorized self-loans from Norasco's account and of breaching his fiduciary obligations to Avianca, S.A., both of which the Court has found to be true. Also, Lenis quite accurately reported that Avianca was in the process of suing Corriea in the United States.

■■■ Because the Court finds, on the undisputed facts of this case, that the statements complained of in both instances of alleged defamation were substantially true, it is unnecessary to consider plaintiffs' further arguments that those statements were either constitutionally protected or privileged. Moreover, because defendants have failed to adduce evidence that the statements complained of were false, a burden they unquestionably would bear at trial, summary judgment for plaintiffs on count I of defendants' counterclaim is appropriate, and will be granted. While plaintiffs have ostensibly limited their cross-motion for summary judgment on the

counterclaim to count I, in point of fact counts II through VI of the counterclaim also hinge on a showing of defamation. Thus the Court's findings essentially eviscerate these counts as well. For that reason, plaintiffs' cross-motion will be construed broadly to cover all counts stemming from the two instances of alleged defamation.[5] On the other hand, counts VII and VIII, breach of contract and indemnification, respectively, unlike counts II through VI, may have some vitality even without a showing of defamation, and plaintiffs' motion may not properly be read to include them.

### C. Plaintiffs' Motion to Compel Andres Cornelissen to Answer the Amended Complaint.

Resolution of plaintiffs' motion to compel defendant Cornelissen to answer the amended complaint turns on two primary issues: whether there has been effective service of process through the alternative means authorized by the Court, and whether the Court has personal jurisdiction over Cornelissen. Plaintiffs' motion with respect to the former issue is essentially unopposed, and the defendants and intervenor were understandably constrained in fully airing their objections to the latter. However, as will be explained more fully below, the issue of effective service is inextricably connected to that of personal jurisdiction, because the Court must make a determination that it in fact has personal jurisdiction under the District of Columbia long arm statute before it can adequately determine whether there has been effective service.

Rule 4(i)(1)(E) provides that when service upon a foreign party, not an inhabitant of or found within the United States, is authorized by federal or state law, such service is sufficient if made "as directed by order of the court." Fed.R.Civ.P. 4(i)(1)(E). The Advisory Committee Notes indicate that while "the authority for effecting foreign service must be found in a statute of the United States or a statute or rule of court of the State in which the district court is held," the rule nonetheless gives the Court considerable flexibility by "permitting the court by order to tailor the manner of service to fit the necessities of a particular case." Fed.R.Civ.P. 4(i), Advisory Committee Note. Whether specified by statute or rule or fashioned by the Court, however, due process requires that the method of service employed be reasonably calculated to give actual notice and afford an adequate opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

Although RICO authorizes nationwide service of process, 18 U.S.C. § 1965, it does not provide for service of process in a foreign country, *Soltex Polymer Corporation v. Fortex Industries, Inc.*, 590 F.Supp. 1453, 1460 (E.D.N.Y. 1984). Thus, authority for the Court's Order allowing alternative service upon Cornelissen must be found, if at all, in the District of Columbia long arm statute. The D.C.Code permits a court to exercise personal jurisdiction when both a tortious act or omission *and* injury occur in the District, D.C.Code § 13–423(a)(3), or when only the tortious injury occurs in the District, but the tortfeasor "regularly does or solicits business, engages in any other persistent course of conduct, or derives a substantial revenue from goods used or consumed, or services rendered, in D.C.," *Id.*, at § 13–423(a)(4). The Court need not decide whether plaintiffs have shown that Cornelissen meets the regular or persistent contacts test of subsection (4). The court

---

5. Alternatively, the Court can simply enter summary judgment *sua sponte* on counts II through VI of defendants' counterclaims. *See Celotex Corp. v. Catrett*, 477 U.S. at 326, 106 S.Ct. at 2554 ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the losing party was on notice that [they] had to come forward with all of [their] evidence."). Because falsity is an essential element common to counts I through VI of defendants' counterclaims, defendants were on notice that they had to come forward with evidence on that element to survive plaintiffs' cross-motion on count I. Hence, the Court may properly enter summary judgment against defendants on all of those counts, notwithstanding the fact that plaintiffs' cross-motion does not expressly include them.

finds it clear that plaintiffs have sufficiently demonstrated that tortious acts and omissions occurred within the District, resulting in injuries in the District, so that they come within the purview of subsection (3). In meeting the criteria of subsection (3), plaintiffs necessarily rely on Cornelissen's close relationship with Corriea, who had his principal place of business in D.C. For example, Corriea operated AAL, Cornelissen's secret off-shore company, from his law office in D.C. Similarly, Corriea operated Norasco from his D.C. office. Over $3,000.00 of the funds Corriea improperly withdrew from Norasco's account were used to pay for repairs to a Rolls Royce co-owned by Cornelissen. Finally, Cornelissen directed plaintiffs' business, including in particular the Twin Otter lease transaction, to FSI, which, not surprisingly, Corriea operated from his D.C. law office.

 Having confirmed that the Court had authority from the D.C. long arm statute for foreign service, the inquiry now turns to whether the particular means of alternative service authorized met the due process requirement of being "reasonably calculated" to give Cornelissen actual notice of the suit and to afford him an adequate opportunity to be heard. Several courts, when confronted with a foreign party successfully avoiding service of process by conventional methods, have upheld service by registered mail. *E.g., International Controls Corp. v. Vesco*, 593 F.2d 166, 175 (2d Cir.1979) (allowing service by regular mail where bodyguard at residence made personal service impossible); *Levin v. Ruby Trading Corp.*, 248 F.Supp. 537, 541 (S.D.N.Y.1965) (allowing service by mail to defendant and two of his attorneys). Indeed, as the District Court for the Southern District of New York observed in *Levin*,

> short of personal service upon the defendant, it is difficult to suggest any other means more reasonably calculated to bring home to the movant that the suit attacked his interest in the property, and to afford him the opportunity to defend. . . .

Under all circumstances, the service of process by ordinary mail upon those named in the Court's order was amply sufficient to satisfy due process requirements.

*Levin v. Ruby Trading Corp.*, 248 F.Supp. at 541. Moreover, this Court has already expressly found that Cornelissen has actual knowledge that he has been joined as a party defendant, and has been receiving litigation status reports from Corriea. Hence, the Court finds that plaintiffs, in complying with the Court's Order, have made effective service of process, in a manner reasonably likely to provide actual notice and an adequate opportunity to be heard.

## CONCLUSION

For the foregoing reasons, the Court this date shall enter the accompanying Order on each of the above discussed motions and cross-motions.

## ORDER

1. Upon consideration of the plaintiff's motion to compel production of American Aerospace Limited (AAL) documents, the opposition and reply memoranda thereto, the magistrate's December 1, 1986 order granting that motion with respect to AAL documents 800495, 800498—800508, 800519—800535, and 800537—800539, the subsequent submission by defendants of AAL documents 800670 through 800699, oral arguments on both sides, and the entire case file herein; and for the reasons set forth in the Court's Memorandum Opinion of this date, the Court finds no valid attorney-client privilege with respect to any of the documents and that the facts of the case as they have become apparent since the magistrate's order clearly demonstrate the relevancy of all of the AAL documents. Therefore, it is hereby

ORDERED, that defendants shall produce all AAL documents, 800495 through 800699 inclusive, not previously produced, to plaintiffs within ten days of the date of this Order; and it is further

ORDERED, that all referrals to the magistrate by this Court are hereby vacated.

2. Upon consideration of defendants' motion for reconsideration of the magistrate's order to produce Aradyne, Limited and Aradyne Corporation documents (collectively referred to as "Aradyne documents"), defendants' *Vaughn* index, and the entire case file herein; and for the reasons set forth in the Court's Memorandum Opinion of this date, it is hereby

ORDERED, that the magistrate's order directing defendants to produce all Aradyne documents responsive to plaintiffs' discovery request be affirmed; and it is further

ORDERED, that defendants shall produce all Aradyne documents listed in their *Vaughn* index within ten days of the date of this Order.

3. Upon consideration of plaintiffs' motion to compel defendant Corriea to answer interrogatories and produce documents with respect to his medical condition and financial statements, the opposition and reply memoranda thereto, oral argument for both sides, and the entire record herein; and for the reasons set forth in the Court's Memorandum Opinion of this date, it is hereby

ORDERED, that plaintiffs' motion to compel be granted in part and denied in part; and it is further

ORDERED, that defendant Corriea shall fully respond to interrogatories 8 and 9 of plaintiffs' fourth set of interrogatories and produce all documents sought by requests 3 and 4 of plaintiffs' fifth request for production of documents.

4. Upon consideration of defendants' motion for summary judgment on the complaint, the opposition and reply memoranda thereto, oral argument on both sides, and the entire record herein; and for the reasons set forth in the Court's Memorandum Opinion of this date, it is hereby

ORDERED, that defendants' motion for summary judgment on the complaint be denied.

5. Upon consideration of plaintiffs' cross-motion for partial summary judgment on count I of the complaint, the opposition and reply memoranda thereto, oral argu-ment for both sides, and the entire record herein; and for the reasons set forth in the Court's Memorandum Opinion of this date, it is hereby

ORDERED, that plaintiffs' cross-motion for partial summary judgment on count I of the complaint be granted; and it is further

ORDERED, that plaintiffs shall draft an appropriate proposed instruction to be given to the jury, and shall submit that instruction to the Court and counsel for defendants not later than sixty days from the date of this Order.

6. Upon consideration of the defendants' motion for partial summary judgment on count I of the counterclaim, the opposition and reply memoranda thereto, and oral argument for both sides; and for the reasons set forth in the Court's Memorandum Opinion of this date, it is hereby

ORDERED, that defendants' motion for partial summary judgment on count I of the counterclaim be denied.

7. Upon consideration of the plaintiffs' cross-motion for partial summary judgment on the counterclaim, the opposition and reply memoranda, oral argument on both sides, and the entire record herein; and for the reasons set forth in the Court's Memorandum Opinion of this date, it is hereby

ORDERED, that the plaintiffs' motion for partial summary judgment on the counterclaim be granted; and it is further

ORDERED, that counts I through VI, inclusive, of defendants' counterclaim be dismissed with prejudice.

8. Upon consideration of the plaintiffs' motion to compel defendant Andres J. Cornelissen to answer the amended complaint, having heard oral argument, and for the reasons set forth in the Court's Memorandum Opinion of this date, it is hereby

ORDERED, that plaintiffs' motion be granted; and it is further

ORDERED, that Andres J. Cornelissen shall answer or otherwise respond to the amended complaint within twenty days of the date of this Order.

SO ORDERED.