FIRST AMERICAN CORP.,
et al., Plaintiffs,

v.

Sheikh Zayed Bin Sultan AL–NAHYAN,
et al., Defendants.

Clark M. CLIFFORD and Robert
A. Altman, Plaintiffs,

v.

FIRST AMERICAN CORP. and First
American Bankshares, Inc.,
Defendants.

Civ.A. Nos. 93–1309(JHG), 95–0877(JHG).

United States District Court,
District of Columbia.

Aug. 13, 1998.

Stephen J. Brogan, Mary Ellen Powers, David E. Miller, Michael P. Gurdak, Peter J. Wang, Jones, Day, Reavis & Pogue, Washington, DC, for First American Corp. and First American Bankshares, Inc.

William H. Jeffress, Jr., Timothy J. Preso, David S. Cohen, James R. Heavner, Jr., Miller, Cassidy, Larroca & Lewin, L.L.P., Washington, D.C., for Clifford and Altman.

John T. Szymkowicz, Szymkowicz & Assoc., Washington, D.C., for H.E. Al–Shorafa.

### *OPINION AND ORDER*

JOYCE HENS GREEN, District Judge.

These related cases arise out of allegations that the Bank of Credit and Commerce International ("BCCI")[1], illegally and secretly sought to acquire ownership and maintain control of First American Corporation ("FAC") and First American Bankshares ("FAB"), collectively known as First American. Two cases are consolidated here for trial and final judgment.

The identities of the parties and the nature of the claims are set forth in greater detail below, but by way of introduction, the following facts situate this dispute: In *First American Corp. v. Sheik Zayed Bin Sultan Al–Nahyan*, Civil No. 93–1309 [hereafter *Zayed*], First American sued 30 defendants, alleging a complex course of conduct, and series of transactions, in violation of federal and state law. *See First American Corp. v.*

---

1. "BCCI", as used herein, refers collectively to BCCI Holdings (Luxembourg) S.A. ("BCCI Holdings"), its two operating subsidiaries, Bank of Credit and Commerce International S.A. ("BCCI S.A.") and Bank of Credit and Commerce International (Overseas) Limited ("BCCI Overseas"), and International Credit and Investment Company (Holdings) Limited ("ICIC Holdings"), an entity previously found to be the alter ego of the other BCCI entities. *See United States v. BCCI Holdings (Luxembourg), S.A.,* 795 F.Supp. 477, 480 (D.D.C.1992).

*Al–Nahyan,* 948 F.Supp. 1107, 1112–15 (D.D.C.1996) (explaining allegations in fuller detail); *see also First American,* 175 F.R.D. 411 (D.D.C.1997). The four active defendants remaining in this case are Clark M. Clifford ("Clifford"), Robert A. Altman ("Altman"), His Excellency Ali Mohammad Al–Shorafa ("H.E.Al–Shorafa"), and Abdul Raouf Khalil ("Khalil").

In the companion case, *Clifford v. First American Corp.,* Civil Action No. 95–0877 [hereafter *Clifford*], Clifford and Altman are the plaintiffs who have sued FAC and FAB for indemnification under Virginia's law of corporations for the costs of defending against federal and state criminal prosecutions brought against them. *See Clifford v. First American Corp.,* 1996 WL 707022 *1–2 (D.D.C. Nov.26, 1996) (describing allegations); *see also generally First American Corp. v. Al–Nahyan,* 2 F.Supp.2d 58, (D.D.C. 1998) (describing the New York prosecution). First American has asserted a series of counterclaims roughly tracking its allegations in *Zayed* and a counterclaim related to fees First American paid to its law firm, which subsequently came to represent Clifford and Altman in their personal capacities.

Presently pending before the Court are a total of five dispositive, or partially dispositive, motions: (1) Clifford's and Altman's Motion for Summary Judgment in Civil Action No. 93–1309 [*Zayed*]; (2) First American's Motion for Partial Summary Judgment on Claims of Breach of Fiduciary Duty; (3) First American's Motion for Summary Judgment on Clifford's and Altman's Indemnification Claims in Civil Action No. 95–0877 [*Clifford*]; (4) Clifford's and Altman's Motion for Summary Judgment on First American's Counterclaims in *Clifford;* and (5) H.E. Al–Shorafa's Motion for Summary Judgment in Civil Action No. 93–1309 [*Zayed*]. Enormous effort has gone into, and enormous resources have been consumed by, these motions. See First American, 180 F.R.D. 166, 167 (D.D.C.1998).

Clifford's and Altman's memoranda of law, as well as First American's, are well argued, and each has a surface appeal. But, upon closer examination of the current state of the record, including the Court's prior rulings on some of the identical arguments advanced here, it is not clear why these motions were filed. Perhaps either or both parties hoped that lightning might strike and the Court would actually grant summary judgment notwithstanding the numerous, long-standing, genuine disputes of material fact that divide them. More likely each side viewed its motion as an opportunity to take "legal discovery;" that is, to size up the other's legal position and get a preview of its key exhibits in support thereof. Possibly, these motions were designed to bridge an information gap that prevents the parties from resolving this matter short of trial. Whatever the motivations, judgment as a matter of law is not appropriate on any of the issues at this time, with one possible exception. For the reasons that follow, all five motions will be denied, and the trial in this matter shall commence as scheduled on October 5, 1998.

## I. BACKGROUND

### A. The Parties

The plaintiffs in *Zayed* are FAC and FAB. Separated by a series of corporate layers, ultimately FAC and FAB were in the banking business. At the top-most layer was Credit and Commerce American Holdings, N.V. ("CCAH"), a Netherlands Antilles corporation. CCAH was privately held, having at most 14 shareholders of record at any one time. First American alleges that these record shareholders were in fact, nominees (i.e.shills) for BCCI. Clifford, Altman and Khalil contest this allegation. CCAH had no employees and operated through a registered agent. The sole asset of CCAH was stock in its wholly-owned subsidiary, Credit and Commerce American Investment, B.V. ("CCAI"), a Netherlands corporation. Like CCAH, CCAI had no employees. In the early 1980s, CCAI came to wholly own FAC.

FAC, formerly known as Financial General Bankshares Holding Company ("FGBHC"), is a Virginia corporation with its principal place of business in Washington, D.C. At all times relevant to the Complaint, FAC was a privately-held bank holding company, *see* 12 U.S.C. § 1841 *et seq.* FAC is the parent corporation of its wholly-owned subsidiary,

FAB, formerly known as Financial General Bankshares, Inc. ("FGB"). At all times relevant to the complaint, FAB was a Virginia corporation and a registered bank holding company with its principal place of business in Washington, D.C. FAB owned several regional banking companies, which in turn owned subsidiary banks in the states of Florida, Georgia, Maryland, New York, Tennessee and Virginia.

Currently, neither CCAH, CCAI, FAC nor FAB are ongoing concerns. The corporations have been substantially wound up by the court-appointed Trustee, Harry W. Albright, Jr., who, on behalf of the United States, exercises "all rights, titles, powers, and privileges of a shareholder of FAC, including, to the extent permitted by applicable law of the state of incorporation, the right to exercise exclusively any and all voting rights and other rights or benefits attached to, derived from, or otherwise attributable to the FAC shares." *See United States v. BCCI Holdings (Luxembourg), S.A.,* 980 F.Supp. 496, 499 (D.D.C.1997) [this is the criminal case against BCCI, which will be referred to hereafter as *"BCCI Holdings"*] (quoting from the Court's Order of June 23, 1992). FAC filed the *Zayed* Complaint "on its own behalf and on behalf of and with the full support of its sole shareholder, the Court-appointed Trustee...." Compl. at 1.

Clark M. Clifford—a defendant in *Zayed* and plaintiff and counterclaim defendant in *Clifford*—entered the banking business after a long and distinguished career in public service, having held high government office during critical and contentious periods of American history. Relevant to these cases are the positions he held in all four corporations. Starting from the top, he was a Managing Director of both CCAH and CCAI. He served as the Chairman of FAC Board of Directors from 1981 to 1991 and concurrently as Chairman of the FAB Board of Directors from 1982 to 1991. During this time, he also was a named partner in the law firm of Clifford & Warnke ("C & W"), which served as counsel to BCCI, CCAH, and General Counsel to FAC and FAB.

Robert A. Altman had largely parallel roles. He also was a Managing Director of CCAH and CCAI. At FAC, he served as both a Director and President from 1981 to 1991. From 1982 to 1991, he too was a member of the FAB Board of Directors. Also a lawyer, Altman was Clifford's partner in C & W during all times relevant herein.

His Excellency Ali Mohammad Al–Shorafa is the former Grand Chamberlain (Director) of the President's Court, and Director of Presidential Affairs for, the United Arab Emirates. H.E. Al–Shorafa was a record shareholder of CCAH beginning in 1982.

Abdul Raouf Khalil is closely linked to Sheikh Kamala Ibrahim Adham ("Sheikh Kamala"). Sheik Kamala is a Saudi Arabian businessman and former head of security for the Kingdom of Saudi Arabia; Khalil was previously Minister of Communications and Deputy Chief of Saudi Intelligence, and the former Executive Administrator to Sheik Kamala. Khalil is currently a business associate of Sheikh Kamala. Khalil also became a record shareholder of CCAH in 1982.

### B. The Story(ies)

In certain respects, the events underlying these cases stretch back more than 20 years. On February 17, 1978, FAB's predecessor, FGB, sought a preliminary injunction against BCCI, among other defendants, to block what it claimed was an unlawful, hostile takeover. As is the case here, FGB also sued its lawyer, claiming that he had a conflict of interest. In a thorough opinion, Judge Gasch set forth the history of the litigation and the timing of the settlements by all defendants except the lawyer. *See Financial General Bankshares, Inc. v. Metzger,* 523 F.Supp. 744, 746–47 (D.D.C.1981), *vacated on jurisdictional grounds,* 680 F.2d 768 (D.C.Cir.1982).

It was that litigation that began Clifford's and Altman's involvement with BCCI and the corporations they would later head. *In re: BCCI,* No. 91–001–1FD1 (Fed.Res.Bd.), Deposition of Clark M. Clifford, June 20, 1991, at 35–36 (FAB/FAC 3874). First American asserts, and Clifford and Altman deny, that from the beginning of their involvement, Clifford and Altman made misleading or false representations to federal regulatory authori-

ties, principally the Board of Governors of the Federal Reserve System ("Federal Reserve"), during that time period.

In 1981, Clifford was offered, and accepted, the Chairmanship of the FAC Board. Altman also joined the Board at that time. At a shareholders meeting in 1982, Clifford and Altman were appointed to the FAB Board, and, at about that time, their law firm, Clifford & Warnke, was designated as the General Counsel for both corporations. It is undisputed that in their roles as directors of, and counsel to, First American, Clifford and Altman looked primarily to BCCI, Agha Hasan Abedi and Swaleh Naqvi—the top two officers of BCCI—and Kamal Adham as the "communications link" with the shareholders of First American's ultimate parent corporation, CCAH. A very material dispute exists as to whether the CCAH record shareholders had authorized BCCI to speak on their behalf, and as to whether Clifford and Altman reasonably relied on BCCI as the communications link.

### 1. Alleged Nominee Scheme

Not in dispute is the fact that both H.E. Al–Shorafa and Khalil were among the record shareholders of CCAH as of 1982. First American claims that they were shareholders in name only, and that BCCI was the beneficial and actual owner of the CCAH shares; that H.E. Al–Shorafa, Khalil, and the others were mere nominees.

First American has produced considerable documentary and testimonial evidence to show that at least some of the CCAH shareholders, for example, H.E. Al–Shorafa, "purchased" a substantial stake in CCAH through loans advanced by BCCI's subsidiary, ICIC, and that under the terms of these loans, the borrower was at virtually no risk but that ICIC obtained the right to control use of almost all of the CCAH stock put up as collateral.

First American alleges that BCCI had two motivations for constructing the nominee scheme. One was to avoid detection of its actual control over CCAH by American banking regulators, who enforce laws requiring that any person or entity with an ownership stake of 5% or more disclose such ownership stake. A second was to inflate the value of BCCI, by creating these "loans," which would appear as assets of the bank even though they were never intended to perform.

Clifford and Altman dispute the entire allegation. They assert that the record shareholders of CCAH were the beneficial owners of their respective stakes in the company, that loans they received from ICIC were not loans from BCCI, and that the loans were bona fide, arm's-length extensions of credit. During the course of their respective tenures as officers, directors and counsel for CCAH and First American, Clifford and Altman made various representations to federal regulatory authorities, including the Federal Reserve Board and the Securities Exchange Commission, to this effect. In the alternative, Clifford and Altman claim that even if BCCI had acquired illegal ownership of First American through the nominee scheme, they, like most of the rest of the world, were duped.

### 2. CCAH Stock Transaction

Not in dispute is the fact that in July 1986, and again in 1987, Clifford and Altman acquired share rights in their client, CCAH. According to CCAH's records, the 1986 share rights were sold at $2,216 each, and the 1987 shares were priced at $2,430 each. At least on paper, Clifford and Altman each financed their respective transactions with loans from a different client, BCCI. The loans were extended on a non-recourse basis, with only the share rights pledged as collateral.

Also not in dispute is the fact that CCAH's records reflect that in March 1988, a portion of both Clifford's and Altman's shares were recorded as sold for $6,800 per share—reflecting an increase in value ranging from 280% to 307%. Subsequently, Clifford and Altman each are recorded having bought further share rights in 1989 priced at $2,774 each and two convertible debentures for $249,000 and $123,000, respectively.

The parties hotly dispute the proper characterization of these transactions. First American charges that the idea of the stock purchase was Clifford's and that he ap-

proached Agha Hasan Abedi, the head of BCCI, with a proposed after-tax profit figure in mind. According to First American the share "purchases" and "sham loans" were then documented to give this "compensation" the appearance of an "investment." *See* Deposition of Swaleh Naqvi, *Zayed*, Sept. 18, 1997, at 1240, 1251. Moreover, First American alternatively characterizes the compensation either as BCCI's bribe to Clifford and Altman or extortion extracted by them from BCCI.

Not surprisingly, Clifford and Altman take a different view. On their account, the purchases of an equity stake in the corporations for which they were responsible were wholly legitimate, even commonplace, occurrences. According to them the financing terms were negotiated at arms length—including a hefty interest charge. They further declare that to the extent that there was a dramatic increase in the value of their investments, that was value they had created through their own managerial acumen, and that the profit figures were not predetermined. *See* Deposition of Imram M.A. Imam, *Zayed, In re Clifford and Altman*, May 27, 1997, at 343–44. Also in dispute is the extent to which existence of these transactions were disclosed ·to Clifford's and Altman's other clients—the Boards of Directors of FAC and FAB, respectively.

### 3. First American's Acquisition of the National Bank of Georgia

In 1987, First American purchased the National Bank of Georgia ("NBG"). First American claims that this was an unfavorable transaction for it all around, and that the only reason it acquired the bank on the terms it did was because the acquisition was in BCCI's interest, and Clifford and Altman favored that interest.

The few facts not in dispute are that Clifford and Altman as directors of CCAH and First American approved the transaction. Also not in dispute is that Clifford & Warnke served as counsel to BCCI in documenting a loan between it and Dr. Ghaith R. Pharaon, a defendant in this action, a fugitive in *BCCI Holdings*, and, at the time, the purported owner of the NBG. Pharaon had acquired NBG in 1978 with a loan from BCCI. First American asserts that BCCI in fact obtained true ownership of NBG at that time, and that the subsequent transfer to First American was simply an intracorporate transaction. Clifford and Altman deny this, and to the extent it is true, they assert that they had no way of knowing it to be true at the time.

### 4. Tampa Money Laundering Investigation and Congressional Inquiry

In February 1988, Panamanian General Manuel Noriega was indicted on federal drug trafficking charges in Tampa, the Middle District of Florida. The indictment generated a congressional inquiry, conducted principally by the Senate Subcommittee on Narcotics, Terrorism, and International Operations of the Committee of Foreign Relations. The investigation of Noriega, who kept accounts at BCCI, led to inquiry of whether BCCI was engaged in illegal money laundering. BCCI retained Clifford & Warnke to represent it in both the criminal and congressional investigations. During the course of this representation it came to light that some of the funds alleged to have been laundered passed through banks owned by First American, but First American itself was never named as a defendant.

Nearly every aspect of Clifford & Warnke's representation is disputed by the parties. Particularly, they dispute the extent of independent control Clifford and Altman, as partners, exercised over the representation, the degree to which a conflict of BCCI's and First American's interests existed with respect to the investigations, the duty to disclose certain facts, and the extent to which these actually were disclosed to First American.

Ultimately, certain BCCI employees were convicted of illegal money laundering. *See United States v. Awan*, 966 F.2d 1415 (11th Cir.1992) (describing investigation and affirming convictions); *see also generally Republic of Panama v. BCCI Holdings (Luxembourg), S.A.*, 119 F.3d 935 (11th Cir.1997) (discussing allegations and dismissing RICO complaint filed against BCCI and others).

## 5. The End of BCCI

In early 1991, the Bank of England received troubling information about BCCI's financial condition and integrity. In response, it commissioned a special audit, which, according to one account, "disclosed evidence of a complex and massive fraud at BCCI, including substantial loan and treasury account losses, misappropriation of funds, unrecorded deposits, the creation and manipulation of fictitious accounts to conceal bank losses, and concealment from regulatory authorities of BCCI's mismanagement and true financial position." Corrigan, Mattingly & Taylor, *The Federal Reserve's Views on BCCI*, 26 Int'l Law. 963, 970–71 (1992) (based on testimony before the Committee on Banking, Finance and Urban Affairs of the United States House of Representatives on Sept. 3, 1991). The results of the audit were shared with regulators in other countries.

At about the same time, in February 1991, it became public that the Federal Reserve had begun an inquiry into, and a grand jury in New York had begun investigating, the alleged link between BCCI and First American.[2] On July 5, 1991, banking regulators in the United Kingdom, Luxembourg and the United States, froze assets owned or controlled by BCCI. In New York, the Superintendent of Banks seized BCCI's assets at various New York banks. By July 6th, eighteen countries had shut down BCCI's operations in their jurisdictions, and, as of July 29, 1991, forty-four countries had closed down BCCI branches. The courts in Europe and elsewhere with jurisdiction over the various BCCI entities placed the BCCI estate in the hands of appointed commissaries, known collectively as the Court Appointed Fiduciaries. *See* Clifford and Altman's *Zayed* Summ. J.Mem.Ex. 5 (copy of plea agreement in *BCCI Holdings*, Crim. No. 91–0655 (Dec. 19, 1991) [hereafter "BCCI Plea Agmt."]) at 2.

Following public disclosure of the allegations of BCCI's illegal ownership interest in First American and the seizure of BCCI's assets, First American suffered a substantial loss of core deposits throughout the second half of 1991.

On November 15, 1991, the United States filed in this Court a three-count Indictment charging BCCI with conspiracy, wire fraud and racketeering. On January 24, 1992, this Court, following findings of fact and conclusions of law with supporting reasons made in open court, accepted the pleas of guilty of the four corporate defendants, collectively known as BCCI, and the Plea Agreement between them and the United States of America. *See* BCCI Plea Agmt.; *see also* Transcript of Guilty Plea Proceedings at 7 (Jan. 24, 1992). As part of its plea, BCCI admitted that its former management and operators had "fraudulently and secretly acquired (1) direct or indirect ownership and control over the shares of First American Bankshares Inc. . . ." BCCI Plea Agmt. at 4.[3]

After accepting the plea, and in accordance with 18 U.S.C. § 1963, this Court then entered an Order of Forfeiture. *BCCI Holdings*, 1992 WL 100334. Under the BCCI Plea Agreement, and pursuant to the Order of Forfeiture, BCCI forfeited to the United States its ownership interests in all property located in the United States, including, without limitation, real property and all tangible and intangible personal property, however held, whether subsequently identified, determined or discovered in the course of the ongoing liquidation proceedings described therein or otherwise identified, determined, or discovered in any manner at any time (excluding property brought into the United States by or on behalf of Court Appointed Fiduciaries of BCCI in the course of the management or disbursement of the liquidation estates). The total value of assets

---

**2.** *See, e.g.,* Peter Truell, *Fed Makes Criminal, Civil Referrals to U.S. Regarding First American Unit*, Wall St. J., Feb. 20, 1991, at A5; Jim McGee, *Fed Probes Foreign Links to First American Bank*, Wash. Post, Feb. 21, 1991, at A1; Peter Truell, *Fed and BCCI Are in Talks On Divestiture*, Wall St. J., Feb. 25, 1991, at A3; Jim McGee, *Bank of Credit and Commerce is Probed by Manhattan D.A.*, Wash. Post, Feb. 27, 1991, at G1.

**3.** In *Zayed*, Clifford and Altman contest this allegation. *But cf. BCCI Holdings (Luxembourg.), S.A. v. Clifford*, 964 F.Supp. 468, 477 (D.D.C. 1997) (in the now-settled civil action brought by Court Appointed Fiduciaries, Clifford and Altman argued in support of their motion to dismiss that action that "BCCI's guilty plea is conclusive proof of the underlying facts . . .").

subject to forfeiture is in excess of $1 billion,[4] including the "net proceeds from the future sale or other disposition or transfer of any stock, security or other interest in First American Bankshares, Inc., but not the stock, security or other interest itself." *See BCCI Holdings*, 980 F.Supp. at 499 (quoting from *BCCI Holdings*, 1992 WL 100334 *1).

To allow for distribution of the liquidated assets of BCCI, the Plea Agreement provided for the establishment of a Worldwide Victims and Creditors Compensation Fund ("Worldwide Victims Fund"), to be maintained by the Court Appointed Fiduciaries, and a U.S. Disgorgement, Compensation, and Penalty Fund ("U.S.Fund"), to be maintained by the United States Department of Justice. BCCI Plea Agmt. ¶ 11.[5]

However:

Executing this forfeiture agreement proved to be complicated.... BCCI did not directly own any interest in First American. Rather, through intermediaries, it acquired a controlling interest in [CCAH]. The extent of this interest was uncertain at the time of the forfeiture order but has been subsequently calculated to amount to 61.156%. Other shareholders in CCAH included appellants Clifford and Altman, whose shares have been estimated

at 0.828% and 0.414% respectively. In turn, CCAH owned [CCAI], which owned FAC, which owned FAB.

Faced with this tangle of interlocking subsidiary corporations, the United States decided that the best course for recovering its forfeited interest was to dissolve First American and liquidate its assets. To facilitate the process, the government proposed the appointment of a trustee under 18 U.S.C. § 1963(e) and developed a plan whereby CCAH would transfer all of its interest in First American to the trustee.... According to the plan, once the trustee completed the sale of First American, the district court would order the equitable distribution of the net proceeds (after payment of expenses) to the United States and any outstanding shareholders of CCAH. [footnote omitted] Because BCCI was not the sole shareholder of CCAH, the government needed to win the approval of others to muster the 75% share vote necessary for the plan to take effect, and on May 12, 1992, CCAH's shareholders, including Clifford and Altman, approved the proposed transaction. Subsequently, the district court appointed a trustee [Albright] and required him to prepare quarterly progress reports.

---

**4.** Attached to the First Order of Forfeiture was a listing of BCCI accounts, with corresponding numbers, names, and approximate balances, which the United States Marshals Service was directed to seize forthwith. Because the government was unable to verify certain information concerning additional forfeitable accounts at the time the Order of Forfeiture was entered, the Court issued a First Supplemental Order on January 31, 1992, 1992 WL 34142, which directed immediate seizure of the specific assets listed therein. The Court later amended the Order of Forfeiture to include additional assets, including property set forth in Second, Third, Fourth and Fifth Supplemental Lists of Forfeited Property. *See BCCI Holdings*, 795 F.Supp. 477 (D.D.C. 1992) (Order of Forfeiture of July 29, 1992 (Second Order of Forfeiture)); Order of Forfeiture of August 19, 1993 (Third Order of Forfeiture); Fourth Order of Forfeiture (December 21, 1994); Fifth Order of Forfeiture (September 20, 1996).

**5.** The broad purpose of the Worldwide Victims Fund is to distribute funds "only to innocent depositors, creditors and other victims of BCCI whose claims are not derived directly or indirectly through violations of United States or other

laws concerning narcotics, terrorism, money laundering, crimes of violence, or other acts generally recognized as felonies or similar crimes under the law of countries subscribing to recognized norms of international justice." BCCI Plea Agmt. ¶ 14.

The purpose of the U.S. Fund is more specific, but no less compensatory. In addition to allowing for reimbursement of the costs of investigation and prosecution of BCCI, bank insurance and other matters, the U.S. Fund is also available to provide "restitution to victims of BCCI, which may include remission to the Court Appointed Fiduciaries in accordance with 18 U.S.C. § 1963(g) for the purpose of facilitating an increase in assets available for distribution by the Court–Appointed Fiduciaries to innocent worldwide victims of BCCI, and which may include claims related to the failure of CenTrust, if any." *Id.* ¶ 12(f). On May 22, 1997, Attorney General Janet Reno "determined that the United States would transfer 100 percent of its share of the forfeited funds to the Worldwide Victims Fund so that the funds might be distributed to all BCCI victims equally on a pro rata basis." *BCCI Holdings*, Notice to the Court at 2 (filed July 11, 1997).

*Clifford v. United States*, 136 F.3d 144, 146 (D.C.Cir.1998).

Thus, the unique circumstances of this case combined with the broad grant of authority to the courts to effectuate the RICO forfeiture provision, *see* 18 U.S.C. § 1963(e), gave birth to a fairly unique creature in the law— a RICO Trustee. In the process of liquidating First American's assets, the Trustee and the FAC Board determined that among the "assets" were intangible property in the form of the claims asserted in *Zayed*;[6] and among FAC's "liabilities" are the claims asserted in *Clifford* among other civil actions. *See Clifford v. United States*, 136 F.3d at 146–47 (identifying the related proceedings). As a result, these related civil actions are part of the RICO liquidation of BCCI.

### 6. Criminal Prosecution and Federal Reserve Administrative Proceeding

Investigations that followed the collapse of BCCI also led to criminal prosecutions brought by the United States and the State of New York against Clifford and Altman for their involvement with BCCI and First American. The Federal Reserve contemporaneously conducted an administrative enforcement proceeding against them. Trial on the federal indictment was held in abeyance while the New York case proceeded.

In the New York proceeding, because of Clifford's failing health, the cases against the two were severed. The case against Altman went to trial in March 1993. Certain counts were dismissed by the court during the trial. The remaining counts were submitted to the jury, which acquitted Altman on August 14, 1993. The State subsequently dismissed the pending charges against Clifford. *See generally People v. Abedi*, 159 Misc.2d 1010, 607 N.Y.S.2d 862 (N.Y.Sup.Ct.1994). In 1994, federal prosecutors informed Clifford and

---

6. The Trustee has realized approximately $410 million in settlements in *Zayed*. C & A's *Zayed* Summ.J.Mem. at 5.

7. If nothing else, Clifford and Altman get credit for tenacity; however, one is reminded of former President Ronald Reagan's memorable line from the campaign trail: "There [they] go[ ] again."

Altman that they would not proceed on the indictments against them.

The Federal Reserve enforcement proceeding was resolved on February 2, 1998, when the Board of Governors entered into a settlement agreement with Clifford and Altman. Under the terms of the agreement, Clifford and Altman relinquished their claim to CCAH stock in favor of the Federal Reserve Board.

In 1994, the Court Appointed Fiduciaries filed a civil action against Clifford and Altman for breach of fiduciary duty. That action was finally resolved yesterday, when this Court accepted the parties' stipulation of dismissal. The terms of the settlement agreement were not publicly disclosed.

## II. DISCUSSION

### A. Clifford's and Altman's Motion for Summary Judgment in *Zayed*, No. 93–1309

Notwithstanding substantial disputes of material fact, Clifford and Altman advance the following arguments to support their belief that they are entitled to judgment as a matter of law on all Counts asserted against them.

### 1. Whether First American Is Estopped From Suing Clifford and Altman for Corporate Mismanagement Prior to 1992

For the third time in this litigation, Clifford and Altman argue that equity does not allow for this suit against them, at least for acts taken in their respective capacities as corporate directors and officers.[7] As an initial matter, Clifford and Altman, and a number of cases treating the doctrine, cast this as an issue of First American's "standing" to sue, a characterization that obfuscates the precise doctrinal issues presented by their argument.[8]

---

8. Standing doctrine implicates the limits on the power of the Court to address only justiciable disputes. The specific form of the more general equitable estoppel doctrine on which Clifford and Altman rely requires the Court to use its equitable powers to render an otherwise justiciable dispute non-justiciable by imposing a disability on the part of the estopped party to proceed

Clifford and Altman argue that after a corporation experiences a change in ownership, it is equitably estopped from suing former management for any wrongs it may have visited upon the corporation. *See Bangor Punta Operations, Inc. v. Bangor & Aroostook. R.R. Co.,* 417 U.S. 703, 710, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974).

Three principles are invoked to support such a result. First is the unjust enrichment theory, the driving consideration of the *Bangor Punta* Court. On this theory, a subsequent purchaser has factored into the purchase price the damages caused by prior mismanagement, and allowing the corporation to sue and recover damages for the benefit of such a purchaser would provide an undesirable windfall. *Id.* at 710–11, 94 S.Ct. 2578. Second is the "tainted shares" doctrine, by which the corporation is estopped from suing where the transferor participated or acquiesced in the wrongdoing. On this theory, the transferee only receives what the transferor could give, and the transferor could not transfer a right to sue himself. *See National Union Electric Corp. v. Matsushita Electric Industrial Co.,* 498 F.Supp. 991, 996 (E.D.Pa.1980). Finally, the contemporaneous ownership rule requires that the plaintiff have been a shareholder at the time of alleged wrongful acts. This rule is designed to avoid so-called "strike suits" and other speculative litigation. *See id.* at 996–97.

Common to each of these equitable principles is a duty on the part of the Court to look beyond the corporate form to examine the economic realities of a transfer of ownership so as to prevent an abuse of the legal fiction that treats a corporation as a separate juridical entity. Commentators' review of the case law agree. *See* Jay W. Eisenhofer & John L. Reed, *Value Litigation,* 22 Del.J.Corp.L. 37, 81 & n. 168 (1997) (collecting cases applying *Bangor Punta* and its exceptions); James D. Cox, *Compensation, Deterrence, and the Market as Boundaries for Derivative Suit Procedures,* 52 Geo.Wash.L.Rev. 745, 766–76 (1984) (collecting and synthesizing cases).

The first and second time the Court addressed this issue, the conclusion was that equity does not require prevention of recovery in this suit—where the ultimate beneficiaries are the innocent depositors and other creditors of BCCI, who will not be unjustly enriched by any recovery. *See First American,* Civ. No. 93–1309, Mem.Op. and Order of Aug. 25, 1995, at 13–15; *First American,* 948 F.Supp. at 1116; *cf. Meyers v. Moody,* 693 F.2d 1196, 1207–08 (5th Cir.1982); *Amen v. Black,* 234 F.2d 12, 23 (10th Cir.1956) ("[E]quity, looking at the substance of the proceedings, will make sure that the beneficiaries of the corporate redress are equitably entitled to the fruits of its processes...."). ·Thus, even on their own terms, Clifford and Altman have introduced no evidence to indicate that the economic realities of any recovery would not be what they appear to be, and the Court again holds that the equitable considerations underlying *Bangor Punta* do not prevent this lawsuit from proceeding to trial.

But more fundamentally, there is good reason to believe that the operative facts triggering *Bangor Punta* considerations are not even present here. The unprecedented circumstances of this case require a close look at the intersection of certain legal fictions and equitable doctrines. Clifford and Altman assert as an "undisputed fact" that a complete transfer of ownership of First American occurred in 1992 from the CCAH shareholders to the United States, upon the entry of this Court's Order of Forfeiture and Order Appointing Trustee. *See* C & A *Zayed* Rule 108(h) Stmt. ¶ 5. First American takes issue with this assertion but both sides appear to misapprehend the legal effect of the Order of Forfeiture. Under the legal fiction of RICO's "relation back doctrine," codified at 18 U.S.C. § 1963(c), the entry of the Order of Forfeiture merely perfected the United States's 61.156% ownership interest in CCAH—an interest that, once judicially recognized, related back to the commission of the acts that rendered the property forfeitable.[9]

---

before the Court as a result of the estopped party's pre-litigation conduct.

9. *See United States v. BCCI Holdings (Luxembourg), S.A.,* 46 F.3d 1185, 1191 (D.C.Cir.1995), aff'g 833 F.Supp. 32 (D.D.C.1993); *United States v. Friedman,* 849 F.2d 1488, 1490 & n. 6

The relation back doctrine has deep common law roots in civil forfeiture law, which governs *in rem* proceedings that are based on the legal fiction that the property becomes tainted by the wrongdoing that renders it forfeitable. *See Buena Vista,* 507 U.S. at 119–22, 113 S.Ct. 1126; *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 680–86, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974); *United States v. Nichols,* 841 F.2d 1485, 1486 (10th Cir.1988). Congress essentially imported the concept into the RICO criminal forfeiture provision in 1984, with passage of the Comprehensive Crime Control Act, Pub.L. No. 98–473, 98 Stat. 1837 *codified as* 18 U.S.C. § 1963(c). *See Nichols,* 841 F.2d at 1488–89; *see generally* Terry Reed, *Criminal Forfeiture Under the Comprehensive Forfeiture Act of 1984: Raising the Stakes,* 22 Am.Crim.L.Rev. 747, 750–76 (1985) (discussing extensively the legislative history behind the 1984 amendments).

Section 1963(c) provides that:

All right, title, and interest in property described in subsection (a) vests in the United States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing pursuant to subsection (1) that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.

18 U.S.C. § 1963(c).[10] As a result, under § 1963(c), "[t]he relevant time is when the criminal acts were committed, not when the defendant was convicted or when the Order of Forfeiture was entered." *BCCI Holdings (In re American Express Bank),* 961 F.Supp. 287, 294–95 (D.D.C.1997).

When applied to the singular facts of this case, the legal fiction of the relation back doctrine operates to stand the *Bangor Punta* estoppel doctrine on its head. Clifford and Altman, who approved the Trustee's proposal to liquidate CCAH, have previously acknowledged that the beneficiary of the RICO trust he administers is the United States. *See Clifford v. United States,* 136 F.3d at 146, 152; C & A *Zayed* Summ.J.Mem. at 30 n. 13. And, under the facts stipulated to in the BCCI Plea Agmt., the United States's title to its 61.156% interest in CCAH vested at the time BCCI acquired First American. *See* BCCI Plea Agmt. at 4. Thus, in a case such as this, where the United States obtains ownership of a corporation by operation of § 1963(c), there is no problem with contemporaneous ownership because under the relation back doctrine, the United States becomes the owner of the property—in this case a controlling interest in CCAH—at precisely the moment the mismanagement giving rise to the RICO counts occurs. As a result, in relation back terms, the predicate fact that triggers *Bangor Punta* estoppel—a post-mismanagement transfer of corporate ownership—does not exist; there can be no post-mismanagement transfer to the United States when it is the very act of mismanagement that causes the transfer.[11]

---

(D.C.Cir.1988); *cf United States v. 92 Buena Vista Avenue,* 507 U.S. 111, 126–129, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993); *id.* 507 U.S. at 131–32, 113 S.Ct. 1126 (Scalia, J., concurring in the judgment).

10. Retroactive application of the section does not offend the Constitution's Ex Post Facto Clause. *See, e.g., United States v. Delco Wire and Cable Co.,* 772 F.Supp. 1511, 1514–15 (E.D.Pa.1991).

11. Clifford and Altman assert that "[d]uring the time ... that Messrs. Clifford and Altman were officers and directors of First American, they and the other CCAH shareholders were the ultimate owners of First American through their share-

holdings in First American's ultimate parent, CCAH." C & A *Zayed* Summ.J.Mem. at 32. At least for purposes of their *Bangor Punta* argument, that proposition is erroneous. Upon entry of the Order of Forfeiture, by operation of law, it became a fact that the "ultimate" owner of First American during the time Messrs. Clifford and Altman were officers and directors was the United States.

In essence, the Court will not disregard the legal effect of the BCCI Plea Agreement and the Order of Forfeiture for purposes of evaluating the Trustee's status as the sole shareholder of the plaintiffs. However, First American has not suggested, and the Court does not hold, that by virtue of the BCCI Plea Agreement, Clifford and

Under the same reasoning, unjust enrichment does not flow from a recovery in an action brought by, or for the benefit of, the United States because, by definition, the wrong that transfers ownership to the United States is not a wrong done to another but a wrong done to the United States as the transferee. Finally, in a relation-back situation, the tainted shares theory operates in reverse. It is the very taint that transfers title to the United States, and rather than serving to estop the Government from proceeding on a claim for the conduct that gives rise to the taint, it is precisely that conduct that confers a cause of action upon the United States. For these additional reasons, the Court rejects for a third time the argument that the Trustee is estopped from suing Clifford and Altman for pre–1992 acts of corporate mismanagement.

### 2. Whether Clifford or Altman Are the Proximate Cause of First American Is Damages

■ First American seeks to recover monetary damages from Clifford and Altman under federal statutory and state common law theories of liability.[12] With respect to the federal claims,

> [a]ny person injured in his [13] business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the dam-

ages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c). The statutory term "by reason of a [RICO] violation" incorporates the common law notion of "proximate cause" as opposed to the broader notion of "but for" causation. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 265–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Proximate cause is used to "label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." *Id.* 503 U.S. at 268, 112 S.Ct. 1311. Proximate cause requires a direct relation between the defendant's conduct and the plaintiff's harm, but the degree of directness cannot be stated as a general rule and must be determined by reference to the context of a specific case.[14] Consequently, while the concept of proximate cause is a "judicial tool" for limiting liability, the context-dependent nature of its application means that it generally is not amenable to summary adjudication.

■ To establish proximate cause under RICO, First American must demonstrate that the RICO pattern or acts are a substantial factor in the sequence of responsible causation, and the injury is reasonably foreseeable or anticipated as a natural consequence. *In re American Express Co. Shareholder Litig.*, 39 F.3d 395, 399 (2d Cir.1994). At least in the Second Circuit, the standard is broader than its application has been Clifford and Altman point to cases that essential-

Altman are precluded from arguing at trial that no RICO violation occurred or that the record shareholders of CCAH were in fact the *bona fide* owners of the corporation.

**12.** For reasons set forth *infra,* the Court has concluded that the *Zayed* complaint can be fairly read to seek the equitable remedy of disgorgement under Count V. Because damages need not be proven for this remedy to be awarded, Clifford's and Altman's proximate cause argument would not dispose of the case against them in any event.

**13.** Undoubtedly women may also bring civil actions under RICO. *See* U.S. Const. amend. XIV § 1 (as incorporated by U.S. Const. amend. V) (Congress shall not "deny to any person ... the equal protection of the laws.").

**14.** *See Raybestos Products Co. v. Younger,* 54 F.3d 1234, 1243 (7th Cir.1995) Context also includes

reference to the policies underlying the cause of action on which the plaintiff proceeds. Clifford and Altman assert that the Court's proximate cause determination under federal law [RICO] is dispositive of the causation determination for the common law counts as well. The argument runs afoul of federalism concerns because it would have the court apply federal proximate cause determinations without reference to state common law precedent under different causes of action. It is not hard to imagine a case in which—with respect to the same set of events—it would be appropriate to use the "judicial tool" of proximate cause to limit RICO liability and simultaneously inappropriate to limit liability for breach of fiduciary duty. Given the common law roots of both federal and state proximate cause standards, in many cases, limits on federal and state liability will be coextensive. But federal limits cannot be imposed reflexively on state law claims, and examination of relevant precedent is required.

ly require that the plaintiff's damages be an "intended" rather than a "reasonably foreseeable" consequence of the RICO scheme. *See id.* 39 F.3d at 399–400 (discussing cases). However, as Judge Winter candidly pointed out, the narrow application in those cases turned on "normative considerations," such as a desire not to allow for double recovery. *Id.* 39 F.3d at 401.

■ These considerations do not require such a narrow application here. Clifford and Altman argue that bad press revealing the BCCI–First American link was a superseding cause that broke the chain linking them to the damages First American claims. The Court cannot accept this proposition as a matter of law, and First American has pointed to more than enough evidence to raise genuine issues of material fact as to what, if any, roles Clifford and Altman played in a racketeering scheme and whether the run on deposits at First American in 1991–92 was a "reasonably foreseeable" consequence of that scheme. Because causation on the RICO counts must go to the jury, the Court need not reach the question of whether proximate cause under RICO is coextensive with causation on First American's common law claims.

### 3. Whether Clifford and Altman Can Be Liable As Aiders and Abettors

■ Count I alleges that First American was a RICO "enterprise" and that Clifford and Altman are liable for violations of 18 U.S.C. § 1962(b), which declares that:

It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise [engaged in interstate commerce].

18 U.S.C. § 1962(b), The thrust of Count I is that defendants H.H. Sheikh Zayed Bin Sultan Ai–Nahyan, H.H. Sheikh Khalifa Bin Zayed Al–Nahyan, and the Abu Dhabi Investment Authority acquired First American through a pattern of racketeering activity. In opposing Clifford and Altman's motion to dismiss, First American argued that those above-mentioned three defendants were alleged to be directly liable under § 1962(b) and that the remaining 27 defendants, including Clifford and Altman, were liable as aiders

and abettors. *See* First Am.'s Opp'n to C & A's Mot. to Dismiss, Nov. 15, 1993, at 19.

But the Court did not read the complaint so narrowly at the time—*see Zayed,* Civ. No. 93–1309, Memorandum Opinion and Order of Aug. 25, 1995, at 28 ("Further some of First American's alleged injuries were caused by *defendants'* maintaining control over First American") (emphasis added)—nor does she now. First American sufficiently alleges and has produced more than ample evidence to demonstrate that there is a genuine issue of material fact as to whether Clifford or Altman are directly liable for violations of § 1962(b) with respect either to the alleged acquisition or control of First American by BCCI.

Alternatively, First American argues that it can go to the jury on an aiding and abetting instruction. At the time First American filed its *Zayed* complaint, in 1993, it was fairly settled that a RICO defendant could be held liable in a civil action as an aider or abettor. *See* G. Robert Blakey and Kevin P. Roddy, *Reflections on* Reves v. Ernst & Young: *Its Meaning and Impact on Substantive, Accessory, Aiding and Abetting and Conspiracy Liability Under RICO,* 33 Am.Crim.L.Rev. 1345, 1423–30 & n. 306 (1996) [hereafter "Blakey & Roddy, *Reflections on Reves* "]; *see also Halberstam v. Welch,* 705 F.2d 472, 477–89 (D.C.Cir.1983) (Wald, J.) (providing scholarly discussion of common law aider and abettor liability).

The next year, however, the Supreme Court handed down its decision in *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). In *Central Bank,* contrary to the holdings in eleven circuit courts of appeals, the Court found that Congress had not intended there to be aider and abettor liability in civil actions brought under Section 10(b) of the Securities Exchange Act of 1934. *Id.* at 191. The Court reasoned that

Congress has not enacted a general civil aiding and abetting statute—either for suits by the Government ... or for suits by private parties. Thus, when Congress enacts a statute under which a person may

sue and recover from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors.

*Central Bank*, 511 U.S. at 182, 114 S.Ct. 1439 (citation omitted). A number of district courts in the Second Circuit have held that *Central Bank* also disposed of aider and abettor liability in civil RICO cases. *E.g., LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,* 951 F.Supp. 1071, 1089 (S.D.N.Y. 1996); *Department of Econ. Dev. v. Arthur Andersen & Co.,* 924 F.Supp. 449, 475–77 (S.D.N.Y.1996). The only circuit court of appeals to pass on the issue is the Third; however, that court only implicitly held that civil RICO aider and abettor liability survived *Central Bank,* without express consideration of the issue. *See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258, 271 (3d Cir.1995); *see also* Blakey & Roddy, *Reflections on Reves,* 33 Am.Crim.L.Rev. at 1512 ("This holding of *Jaguar* on aiding and abetting a RICO violation represents an analytically unassailable result and therefore it should be universally followed.").

This is a difficult issue of statutory interpretation. One consideration is that in the RICO context, the Supreme Court's concern about the absence of a general civil aiding and abetting statute has less force because a civil action under § 1964(c) requires a predicate *criminal* violation of § 1962, which incorporates to some extent the general criminal aiding and abetting statute, 18 U.S.C. § 2. *See* 18 U.S.C. § 1962(a). A second consideration is that the negative inference that could arise from the absence of mention of 18 U.S.C. § 2 in either § 1962(b) or (c) has to be reconciled with Congress's explicit directive that RICO be construed liberally. *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497–98, 105 S.Ct. 3275 (1985).

Preliminarily, I am persuaded that a civil RICO action is distinguishable from an action under § 10(b) of the Securities Exchange Act of 1934, and that with respect to RICO, Congress intended there to be aiding and abetting liability in civil actions. However, having found that First American may proceed at trial against Clifford and Altman for direct violations of § 1962(b), the issue need not be finally resolved unless and until First American requests an aiding and abetting instruction on Count I.

Finally, Clifford and Altman argue that they cannot be tried as conspirators under § 1962(d) for conspiring to aid and abet a violation of § 1962(b); they do not address whether they can face liability under § 1962(d) for conspiring to violate § 1962(b) directly. First American relies principally on the Supreme Court's recent decision in *Salinas v. United States,* —— U.S. ——, —— – ——, 118 S.Ct. 469, 477–78, 139 L.Ed.2d 352 (1997) to say that they can. First American may be correct, although it is unclear whether *Salinas* offers any guidance as to what must be agreed to in a § 1962(d) conspiracy. This issue also can be deferred until it is time to determine jury instructions, and so it shall.

### 3. Whether Clifford or Altman "Operated or Managed" BCCI in violation of § 1962(c)

■ In Count II, First American alleges that Clifford and Altman are liable under § 1962(c) for managing a different RICO enterprise—BCCI. To conduct or participate, directly or indirectly, in the conduct of a RICO enterprise's affairs, one must participate in the operation or management of the enterprise itself *Reves v. Ernst & Young,* 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). From the outset, the parties dispute how the BCCI enterprise should be defined. First American would have the BCCI enterprise include FAC and FAB; Clifford and Altman would not. That is an issue for the jury to sort out. Additionally, the fact that Clifford's and Altman's acquisition of CCAH stock with loans from BCCI can be characterized either as a bribe (which would mean they did not operate or manage BCCI) or as extortion (indicating that they did) highlights why summary judgment is inappropriate.

■ Finally, even if the enterprise were to be limited strictly to the BCCI corporate entities, First American has produced sufficient evidence to raise genuine issues of fact as to whether Clifford's and Altman's respec-

tive roles as outside counsel so surpassed provision of "routine legal services" that they can be said to have participated in the operation or management of BCCI. *See Handeen v. Lemaire,* 112 F.3d 1339, 1349 (8th Cir. 1997). For example, on deposition, Dildar Husain Rizvi, a senior BCCI official partially responsible for its establishment in 1972, testified that

> We never treated Robert Altman as separate from BCCI. He was not treated as a lawyer. He was not treated as an officer of First American. He was one of the insiders, as far as BCCI was concerned. He was "our man in Washington."

Deposition of Dildar Husain Rizvi, *Zayed,* May 12, 1998, at 145.[15] Given the multiple roles played by both Clifford and Altman, the complexity of the allegations, and the susceptibility of the deposition testimony and documentary evidence to widely varying interpretations, Count II also must go to the jury.

### 4. Whether Clifford or Altman Breached His Fiduciary Duties To First American

Clifford and Altman argue that Count V states a claim against them for breach of fiduciary duty only in their capacities as directors and officers of FAC and FAB, respectively, and not as attorneys for FAC and FAB.[16] If this premise is accepted, they then claim that they are entitled to judgment as a matter of law because the only fiduciary duty they owed was to the ultimate parent corporation, CCAH, and even if they mismanaged First American as alleged, they only did so at the behest of, and for the benefit of, the owners of CCAH, be they the record shareholders or BCCI.

■ With respect to the first point, Count V could have been better drafted, but it fairly states a claim against Clifford and Altman for breach of fiduciary duty in their

respective roles as counsel even as it presently reads. As is standard practice, Count V opens by incorporating by reference the previous, numbered paragraphs—all 659 of them. Included in that collection are paragraphs 42 and 43, which allege that Clifford and Altman, respectively, were legal counsel to BCCI, the record shareholders of FGB/CCAH and First American. Both paragraphs also allege a general breach of fiduciary obligations without limitation. What is confusing is that paragraph 661 specifically restates the allegation of Clifford's and Altman's respective roles only as officers and directors of First American, and the following paragraph alleges that by "the aforestated conduct" they breached their duties. Read liberally, however, "the aforestated conduct" must include the entire 659-paragraph novella that precedes Count V—including the allegation that Clifford and Altman breached their fiduciary duties as counsel.

Moreover, the point of notice pleading is to reasonably inform the defendant of the nature of the charges. Clifford and Altman, having retained their own expert witness on the fiduciary duties of lawyers and having deposed First American's legal ethics expert, clearly were on notice that they were being charged with breaching their fiduciary duties as First American's counsel. Having found that Count V does state such a claim, discussion of whether First American can prevail upon it as a matter of law will be had in the context of its motion.

As to Clifford and Altman's second point, that as a matter of law they owed no duty to First American as an entity, and therefore there was no duty for them to breach, the argument is too clever by half. Taken on its own terms, Clifford's and Altman's argument that their only duty was to First American's parent falls apart if the relation back theory

---

15. Clifford and Altman have filed a motion in limine to prevent introduction of Rizvi's *de bene esse* deposition at trial, arguing that it would unfairly prejudice them because they did not receive adequate time for cross examination. The Court will take that motion up in due course, but, even if granted, the deposition is admissible for summary judgment purposes because the opportunity for cross is irrelevant where the Court

must make all reasonable inferences from the testimony in the non-moving party's favor.

16. To appreciate the yawning chasm between the parties' positions, the Court notes that First American has cross-moved for partial summary judgment on Count V, arguing almost exclusively that Clifford and Altman breached the fiduciary duties they owed First American as attorneys.

is applied here. That would mean that Clifford and Altman owed a fiduciary duty to First American's ultimate parent, the United States, which First American claims they breached. This would be a novel, and, in principle, justified application of the theory. However, in this case such application would effect a form of issue preclusion on Clifford and Altman which is unwarranted.

But even without the relation back theory, Clifford's and Altman's position is unsound. Both sides recognize that "[t]he duties of the directors of wholly owned subsidiaries have not been articulated in the law." Eric J. Gouvin, *Resolving the Subsidiary Director's Dilemma*, 47 Hastings L.J. 287, 324 (1996) [hereafter "Gouvin, *Subsidiary Director's Dilemma*"]. Indeed, "[c]ase law leaves subsidiary directors wondering whether their duty runs primarily to the parent corporation as shareholder, to the subsidiary corporation itself as an entity, or even to other constituencies such as creditors, regulators, employees, and communities." *Id.* at 289.

Clifford and Altman rely principally on the Delaware Supreme Court's decision in *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171 (Del.1988), for the proposition that a wholly-owned subsidiary's director's fiduciary duties flow only to the parent corporation. That overstates the "narrow confines" of the court's holding. *See id.* at 1178 (denying rehearing). In *Anadarko*, the parent corporation decided to spin off a wholly-owned subsidiary, and in advance of doing so, three kinds of contingent equity interests in the spin-off corporation were sold. *See id.* at 1173. Purchasers of these interests sued the spin-off's board for breach of fiduciary duties for agreeing to modifications of contracts between the parent and the spin-off in the interim between when these interests were sold and the date the spin-off changed from being nothing more than an asset of the parent to an independent entity. The court held that during that liminal period, the spin-off's Board did not owe any fiduciary duties to the prospective owners. *Id.* at 1177.

Directors owe fiduciary duties to the corporation and to the shareholders, taken as a whole. *See Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 43 (Del.1994). Even assuming the Virginia courts would follow *Anadarko*, they would understand it to apply only to the question of who are the shareholders to whom the directors of a wholly-owned subsidiary owe duties when the corporation is being spun off—the parent or the prospective purchasers. *Anadarko* teaches that the answer to that question lies in a careful examination of the nature of the prospective purchasers' interest in the spin-off.

The issue here concerns the scope of the directors' duties to the corporation. Using "standing" rhetoric again, Clifford and Altman argue that no duties are owed to First American. The Court rejects that argument and holds that the directors of a wholly-owned subsidiary owe the corporation fiduciary duties, just as they would any other corporation. As a result the subsidiary has standing to sue for breach of those duties.

The far more perplexing issue is to define the scope of the duties. For example, assuming the director's principal duty to the wholly-owned subsidiary corporation is to manage it in the best interests of its sole shareholder, the parent corporation, *see Anadarko*, 545 A.2d at 1174, who is to determine what the best interests of the parent are? May (or must) the subsidiary's Board make an independent business judgment about the parent's best interests or is the subsidiary's Board obliged to accept the edict of the parent's Board in all circumstances? Those questions will await future cases and further commentary [17] for answers.

Here it is sufficient to note that Clifford and Altman had fiduciary duties to manage CCAH, CCAI, and First American in such a way as to avoid violations of United States law. Whatever the precise language required to articulate this duty—an issue the Court will sort out with the parties in the context of fashioning jury instructions—First

---

17. Professor Gouvin, who as a practicing attorney wrestled with these questions in the banking context, *see* Gouvin, *Subsidiary Director's Dilem-* *ma*, 47 Hastings L.J. at 290 n. 12, has provided a helpful beginning to what the Court hopes will become a more robust discourse.

American has produced sufficient evidence to raise genuine issues of material fact as to whether Clifford and Altman did so.

**B. First American's Motion for Partial Summary Judgment on Count V in Zayed, No. 93–1309**

█ Lawyers owe their clients certain fiduciary duties. Like other agents, they owe both a duty of loyalty and a duty of care. Previously, the Court ruled that First American has not asserted a claim of "simple negligence" against Clifford and Altman, *see First American,* 175 F.R.D. at 413–14; *First American,* 948 F.Supp. at 1119 & n. 13, by which it was meant that First American has not filed a malpractice action for a breach of the lawyer's duty of care. Rather Count V asserts a breach of the duty of loyalty. Clifford and Altman would have this narrowed to "intentional" breach of fiduciary duty, but state of mind is immaterial to the question of whether there was a breach. It can play a role in determining the appropriate remedy. The inquiry is whether the lawyer put himself or herself in a position by which he or she could not give full loyalty to which the client is entitled. *See Avianca, Inc. v. Corriea,* 705 F.Supp. 666, 679 (D.D.C.1989), *aff'd mem.,* 70 F.3d 637, 1995 WL 650232 (D.C.Cir.1995).

**1. Whether Clifford and Altman Breached Their Fiduciary Duties**

█ First American argues that Clifford and Altman breached their fiduciary duties as lawyers in three respects: (1) they had an impermissible conflict of interest in serving as First American's counsel while simultaneously representing BCCI; (2) they were incapable of providing First American with their independent judgment, respectively, because they were so influenced by material ties to BCCI; and (3) they failed to disclose their conflicts of interest to First American.[18]

By taking on the roles of Directors of CCAH, CCAI, FAC, and FAB while simultaneously acting as counsel to BCCI, CCAH, FAC and FAB, Clifford and Altman certainly stepped out on an ethical high wire from which even the most nimble of attorneys could lose his balance and fall. Whether that is what happened here must be left to the jury, in the first instance.[19]

As to the legal standard that applies, when First American (FGB at the time) first sued its lawyer for breach of fiduciary duty related to its dealings with BCCI, it argued that a lawyer's common law fiduciary duties are reflected in the rules of professional conduct promulgated by the court with supervisory authority over the lawyer. Judge Gasch accepted that argument, but he was ahead of his time. *See FGB I,* 523 F.Supp. at 762–63 & n. 64. Although vacated, his opinion has subsequently been adopted in substance in the District of Columbia.[20] It is now generally recognized that professional ethical standards guide determination of a lawyer's fiduciary duties, but the two are not necessarily coextensive in every case. *Hendry,* 73 F.3d at 401; *see also Maritrans GP Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 602 A.2d 1277, 1284–86 (1992).

An important consideration for keeping some breathing room between disciplinary rules and common law fiduciary duties is the fact that disciplinary rules are animated by related but distinguishable policies, and they have been evolving at a more rapid pace than the common law. Consequently, disciplinary

---

**18.** First American advances a few tag-along arguments to show that they also breached their fiduciary duties as officers and directors. For the same reasons, these contentions must be resolved at trial.

**19.** Summary judgment must be denied in part because so much of the evidence consists of deposition testimony from witnesses with obvious biases. Even when the facts are not disputed, the inferences to be drawn therefrom vary quite widely. However, depending on the evidence at trial and the jury's verdict on Count V— and without seeking to promote further defores-

tation, *see First American,* 180 F.R.D. 166, 167— the issue is close enough with respect to some of the asserted conflicts of interest that it may be possible to rule on Count V as a matter of law after the trial.

**20.** *See Hendry v. Pelland,* 73 F.3d 397, 401 (D.C.Cir.1996); *Griva v. Davison,* 637 A.2d 830, 846–47 (D.C.1994); *BCCI Holdings (Luxembourg), S.A. v. Clifford,* 964 F.Supp. at 481; *Resolution Trust Corp. v. Gardner,* 788 F.Supp. 26, 30 (D.D.C.1992); *Avianca,* 705 F.Supp. at 679.

rules vary, and sometimes conflict, from jurisdiction to jurisdiction. The argument in this case is Exhibit A for that proposition. First American relies extensively on American Bar Association's Model Code of Professional Responsibility, with its constituent Canons and disciplinary rules. *See Griva*, 637 A.2d at 837. Clifford and Altman rely almost exclusively on the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, approved by the American Law Institute on May 12, 1998. *See* 66 U.S.L.W. 2716 (May 26, 1998). Both sets of standards recognize that a lawyer has a duty to avoid conflicts of interest, to exercise independent judgment on behalf of a client, and to fully disclose conflicts of interest to affected clients, but the terminology for enunciating these standards varies.

The Court need not parse the issue that finely at this juncture, however, because under either standard, or even relying solely on bedrock principles of agency law, the material facts necessary to a determination of the issues are in dispute. To be sure, the allegations First American asserts are serious, and there is substantial record evidence to support them. But Clifford and Altman have produced sufficient evidence to dispute whether the interests of BCCI and First American were ever in conflict, whether Clifford and Altman knew or should have known that the interests were in conflict, whether they had a duty to inquire further to ascertain whether a conflict of interest existed, and whether they adequately disclosed any conflicts of interest that may have existed.

### 2. If Clifford and Altman Are Proven Liable For Breach of Fiduciary Duties, Is First American Entitled to Disgorgement of Legal Fees and Other Benefits?

As a question of law and equity, the remedy of disgorgement is a common remedy for a lawyer's breach of fiduciary duty, but there are differing approaches to what must be disgorged. *See Hendry*, 73 F.3d at 403. The issue here is whether First American has adequately asserted a claim for disgorgement in its complaint. The Court ordered additional briefing on the issue and has concluded that First American has asserted such a claim and that Clifford and Altman will not suffer undue prejudice in having to defend against it at trial.

Rule 54(c) of the Federal Rules of Civil Procedure provides that, except in cases of judgment by default, "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." *See Fielding v. Brebbia*, 399 F.2d 1003, 1005 n. 7 (D.C.Cir.1968) ("The court must in its final judgment grant such relief as the claimant may establish he is entitled to receive"). Courts liberally construe Rule 54(c), "leaving no question that it is the court's duty to grant whatever relief is appropriate in the case on the facts proved." *Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.*, 705 F.2d 712, 716 (4th Cir.1983). There are limits, however, to the scope of Rule 54(c). A party will be denied relief not specified in its Complaint where the opposing party would suffer prejudice. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424, 95 S.Ct. 2362 (1975).

The prayer for relief in the *Zayed* complaint does not specifically mention disgorgement, or even equitable relief by name, but instead seeks "other and further relief as this Court deems appropriate." Clifford and Altman argue that even the most generous interpretation of this language cannot include a disgorgement claim, notwithstanding the fact that such relief is a common remedy for breach of fiduciary duty. *See* Eileen A. Scallen, *Promises Broken vs. Promises Betrayed: Metaphor, Analogy, and the New Fiduciary Principle*, 1993 U.Ill.L.Rev. 897, 911 (1993). The Court does not generally favor pugilistic rhetoric to describe litigation, but Clifford and Altman essentially argue that First American's disgorgement claim, asserted at this late date, is a "sucker punch." They argue that they had been led to believe that no equitable claims were asserted and therefore they did not develop defenses to such claims, like unclean hands, in discovery.

The record does not support the argument. There are facts in the present case that indicate that Clifford and Altman were

very much aware that First American intended to seek disgorgement. For example, in a letter from First American's counsel to Clifford & Warnke, First American stated that disgorgement of legal fees was the appropriate remedy for the conflict of interest alleged in *Zayed*.[21] In addition, First American repeatedly asserted its intent to seek disgorgement in a number of pleadings. One pleading provided that "First American has alleged that the stock transactions created irreconcilable conflicts of interest . . . that violated their fiduciary duties . . . the appropriate remedy for a breach of fiduciary duty arising out of a conflict of interest is disgorgement of all compensation paid . . . First American will be entitled to disgorgement of the stock should it prevail on its [breach of fiduciary duty] claims."[22] In its Opposition to Clifford and Altman's Partial Summary Judgment Motion, First American repeatedly stated that proof of a breach of fiduciary duty entities First American to disgorgement of all compensation Clifford and Altman received. First Am.'s Disgorgement Mem. at 7, Ex. 8, Opp'n at 29–30, 35. Furthermore, Clifford and Altman deposed Charles W. Wolfram, First American's ethics expert, and questioned him on the issue of disgorgement. *Id.* at 7, Ex. 10 (Wolfram Dep.).

As to Clifford's and Altman's claim of prejudice, under D.C. law, unclean hands acts only as a defense to equitable, and not legal, actions. *See Johns v. Rozet*, 141 F.R.D. 211, 220 (D.D.C.1992); *see also Truitt*

*v. Miller*, 407 A.2d 1073, 1079–80 (D.C.1979). Clifford and Altman identified an unclean hands defense in their Answer, but argue that they did not pursue evidence on this defense during discovery because it was not a legal bar to the damages claims presented by the *Zayed* complaint. It appears from the record that Clifford and Altman did conduct certain discovery to unearth whether an unclean hands defense is applicable against First American. For example, in two related cases, *Clifford v. First American Corp.*, Civil Action No. 7071–95 (D.C.Super.) ("C & W") and *Clifford v. First American Corp.*, Civil Action No. 95–0877 (JHG/PJA) (D.D.C.) ("Clifford"), First American filed counterclaims explicitly seeking disgorgement remedies for breach of fiduciary duty.[23] Clifford and Altman had the opportunity and incentive to develop an unclean hands defense in these cases, and did not have the excuse that they were not aware that disgorgement was an issue in these suits. Although Clifford and Altman complain that the discovery period in *C & W* was truncated, they still deposed a number of witnesses, and focused on whether there was any kind of misconduct by First American and its directors.[24]

In light of the fact that Clifford and Altman had ample notice of First American's intent to seek disgorgement as a remedy, and that they were not prejudiced in developing an unclean hands defense, the Court finds that such relief will be granted if the facts at trial support a breach of fiduciary

21. First Am.'s Disgorgement Mem. at 6 n. 12, Ex. 2, Letter from S. Brogan to P. Warnke dated August 5, 1994 ("As you know, the RICO actions filed by First American . . . charge Clifford & Warnke lawyers with an irreconcilable conflict of interest in the firm's joint representation of First American and BCCI. The appropriate remedy for such a conflict of interest would be disgorgement of more than $12 million in legal fees paid by the First American Companies to Clifford & Warnke between 1978 and 1991.") at 5.

22. First American Memo at 6–7, Ex. 6, Joint Opp'n of Court–Appointed Trustee and First American to Application of Clifford and Altman for Relief from Plan of First Distribution, *United States v. BCCI Holdings (Lux.), S.A.*, Misc. No. 96MS00367 (JHG) (D.D.C.) (Jan. 16, 1997) at 10 n. 14.

23. Clifford and Altman concede that the counterclaims in *C & W* and *Clifford* are in substance the same as those pled in *Zayed*. *See* First American Memo at 8 n. 16, Ex. 16, Mem. Law in Opp. to Mot. of Albright for a Protective Order, *C & W* (June 11, 1996) (stating that "counterclaims repeat, in large part, allegations of an earlier civil RICO lawsuit filed by First American" and characterizing counterclaims as "virtually identical to those underlying First American's RICO case.") at 2–3.

24. Depositions were taken from Messrs. Ayres, Adams, Mathias, Beddow, Albright and Moscow. First American claims that any evidence from these witnesses focusing on First American's misconduct is irrelevant and inadmissible. *See* Motion In Limine of First American To Exclude Certain Irrelevant Evidence and Argument, *Zayed* (July 6, 1998).

claim. The thorny issue of what must be disgorged will be taken up if and when it becomes ripe.

### C. First American's Motion for Summary Judgment in *Clifford,* No. 95–0877

In *Clifford,* Clifford and Altman both claim that they are entitled to mandatory indemnification under Virginia law, and FAC's and FAB's articles of incorporation, for the costs of their legal defense of proceedings flowing from the federal and New York indictments, one federal and one from the People of New York. *See Clifford,* 1996 WL 707022*1–2. Under Virginia law:

> Unless limited by its articles of incorporation, a corporation shall indemnify a director who entirely prevails in the defense of any proceeding to which he was a party because he is or was a director of the corporation against reasonable expenses incurred by him in connection with the proceeding.

Va.Code Ann. § 13.1–698 (Michie 1997). The same rule applies to officers. *Id.* § 13.1–702(1). FAC's articles of incorporation are silent on indemnification, and FAB's simply track the language of the statute. *See* Arts. of Incorp. of FAB ¶ 4(a) (FAB/FAC 4160).

First American has moved for summary judgment, conceding that Clifford and Altman "entirely prevailed" in the criminal trial in New York, but arguing that neither Clifford nor Altman was indicted and tried "because he ... was a director of" FAB or FAC. Failing that, First American seeks partial summary judgment to the effect that certain legal fees claimed by Clifford and Altman for legal advice and representation related to the contemporaneous inquiries being conducted by the Federal Reserve and the United States Senate were not incurred "in connection with" the criminal prosecutions. Additionally, even if Clifford and Altman are entitled to indemnification for their roles as officers and directors, First American seeks partial summary judgment requiring Clifford and Altman to apportion their defense costs between their indemnifiable and nonindemnifiable roles.

### 1. Whether Clifford or Altman Was Made Party To the Criminal Proceedings "Because" He Was An Officer or Director of First American

As a threshold matter, both sides presume, without explicitly arguing, that under Virginia corporate indemnification law the question of whether an officer or director has been made party to a proceeding because of his status in the corporation is a question of fact rather than law. Both sides reference the fact that Clifford and Altman are mentioned as FAB directors in the New York, but not the federal, indictment,[25] but neither takes the position that the issue is decided solely by looking at the face of the charging document, be that a criminal indictment, or a civil or administrative complaint.

■ The Court agrees with both parties and holds that under § 13.1–698, the issue of whether a director (or officer) has been made party to a proceeding "because he is or was a director of the corporation" is an issue of fact to be determined by examination of the substance of the proceeding in question.

■ Moreover, under Virginia law, the fact that a person was an officer or director of the corporation must have been a substantial factor in causing that person to be made party to a proceeding. Virginia adopted a more restrictive indemnification standard than some other states. *Compare* Model Business Corporation Act Ann. § 8.52 (3d ed.1994) (requiring director to be "wholly successful" to be entitled to mandatory indemnification) *with* 8 Del.Code Ann. § 145(c) (mandatory indemnification "to the extent that a director .... has been successful on the merits or otherwise in defense of any action, suit or proceeding ...."*) and Merritt–Chapman & Scott v. Wolfson,* 321 A.2d 138, 141, 144 (Del.1974) (statute allows for partial indemnification). Where it is shown that the director's corporate status was merely an incidental factor in causing the director to being made party to a proceeding, the director is not entitled to mandatory indemnification.

---

**25.** For the text of both indictments, see *Clifford,* 1996 WL 707022 * 1–2.

Clifford and Altman have introduced substantial, perhaps overwhelming, evidence to demonstrate that their respective roles as FAC and FAB directors was a substantial factor in their being criminally indicted. Because this is an issue of material fact, and because both parties have introduced sufficient evidence to demonstrate that the fact is in dispute, it must be resolved at trial.

### 2. Whether All of the Legal Fees Claimed Were Incurred "In Connection" With the Criminal Proceedings

Clifford and Altman were subject to four contemporaneous proceedings: federal and state criminal prosecutions, a Federal Reserve administrative inquiry, and a congressional investigation conducted by subcommittees of both the Senate and the House of Representatives. Then, as now, they retained some of the best legal talent available. Indeed, they took First American's lawyer with them.[26] It is undisputed that a substantial amount of the fees billed by two of the firms representing Clifford and Altman during this time was for services rendered in connection with the Federal Reserve and congressional proceedings. The precise amount is in dispute, but First American's expert puts the figure at nearly $5 million.

Clifford and Altman contend that they are entitled to be indemnified for the full expense of these services because the only reason they needed such high-powered legal representation for their testimony before Congress and the Federal Reserve was that anything they said under oath in those proceedings could and would be used against them in the criminal cases. Therefore they argue that the "inseparable relationship between [the Federal Reserve inquiry and the congressional investigations] and the criminal cases, and the concomitant necessity of treating them as part, of the criminal defense effort," C & A *Clifford* Opp'n at 15, means that these expenses were. incurred "in connection with" the criminal cases.

It may be that this argument is the tail wagging the dog, for if the proceedings were so inseparable as to form a single proceeding, as that term is used in the Virginia statute, then it would be necessary for Clifford and Altman to demonstrate that they "entirely prevailed" in all of them to be indemnified at all. Given the terms of their settlement with the Federal Reserve and the final report of the Senate Subcommittee, that would be a very difficult showing to make. *See* Sen. John Kerry and Sen. Hank Brown, *The BCCI Affair: A Report to the Sen. Committee on Foreign Relations*, S.Prt. 140, 102d Cong., 2d Sess. 369 (1992) ("The totality of the information concerning Clifford and Altman leads to the conclusion that regardless of whether they too were deceived by BCCI in some respects, both men participated in some of BCCI's deceptions in the United States.").

But the term "proceeding" in the indemnification statute has a more concrete meaning, and despite the overlap in subject matter, each inquiry or investigation was a distinct "proceeding" as that term is used in § 13.1–698. It therefore is simply another question of fact as to whether the legal fees clearly incurred in connection with the Federal Reserve inquiry and the congressional investigations can also be said to have been incurred "in connection with" the criminal cases. Because this issue must go to the jury, First American will also be entitled to contest whether Clifford's or Altman's legal fees were "reasonably incurred" within the meaning of the statute.

### 3. Whether Clifford and Altman Are Required To Apportion Their Legal Fees Between Their Indemnifiable and Unindemnifiable Roles

First American argues that even if Clifford's and Altman's respective roles as directors of First American were substantial factors in making them party to the criminal cases, so were their other respective roles as directors of CCAH, CCAI and as legal counsel. Therefore, the argument goes, First

---

**26.** First American retained Davis, Polk & Wardwell to represent it. For a time, the firm also represented Clifford and Altman in their respective capacities as directors or officers of First American. In the spring of 1991, Davis Polk withdrew from its representation of First American and represented Clifford and Altman in their personal capacities.

American cannot be stuck with the entire legal bill and it should only be required to pay its fair share. Not surprisingly, First American has an expert who says he can determine with sufficient certainty what that figure is. Clifford and Altman respond that they would have had to put on the same defense even if they were indicted solely as directors of FAC and FAB. At a minimum, they argue, the jury should determine whether apportionment is required, and if it is, whether it is possible, and if it is, what that apportionment should be. The Court agrees. Clifford and Altman are entitled to argue to the jury that their entire defense effort would have been required in any event, and if it were not, that the billing records, which undoubtedly could have been more carefully kept, are susceptible to a reasonably certain apportionment.

## D. Clifford's and Altman's Motion For Partial Summary Judgment on First American's Counterclaims in *Clifford*, No. 95-0877

Clifford and Altman argue that all of First American's counterclaims filed in *Clifford* are barred by the statute of limitations. A counterclaim must be timely in its own right. *Clifford*, 1996 WL 707022 * 4. The applicable statute is three years. D.C.Code Ann. § 12–301 (1991). The counterclaims will be timely filed if they accrued within three years of the filing of the counterclaims, or in the case of compulsory counterclaims, within the filing of the *Clifford* complaint.

■ First American essentially counterclaims with respect to two sets of conduct. The first is the complex course of conduct complained of in *Zayed*. The second is a more specific complaint that in 1990 and 1991, Clifford and Altman were being personally represented by Davis, Polk & Wardwell while First American was footing the bill. First American claims that it did not learn about this until 1994.

Clifford and Altman present persuasive arguments with respect to the timeliness of the counterclaims related to the *Zayed* conduct, but ultimately, the Court concludes, as in 1996, that there are genuine issues of material fact with respect to when First American's counterclaims accrued. *See Clifford*, 1996 WL 707022 *3–4. Consequently, summary judgment is not appropriate.

## E. H.E. Al–Shorafa's Motion for Summary Judgment

■ In this lawsuit, H.E. Al–Shorafa must defend against charges that he participated in a course of events that amount to a RICO enterprise, common law fraud, aiding and abetting and civil conspiracy. Not in dispute is the fact that through a series of purchases in the mid 1980s, H.E. Al–Shorafa became the record shareholder of nearly 10% of CCAH. *See* Deposition of Al–Shorafa, Aug. 7, 1996, at 31. Also not in dispute is the fact that H.E. Al–Shorafa lacked the personal resources to purchase these shares, and that he did so with loans supplied by BCCI's subsidiary, ICIC. *Id.* at 22–27, 32, 264–67, 354. On deposition, H.E. Al–Shorafa testified that it was his understanding that he would not be held liable to repay these loans. *Id.* at 104–05; First Am. Opp'n Ex. FAB/FAC 472. He elaborated that as a result of being held harmless from liability, he neither inquired into why representatives of ICIC were interested in pursuing these transactions nor did he pay particular attention to the contents of the documents that ICIC presented to him for signature.

H.E. Al–Shorafa explained that this arrangement was the implementation of a "beautiful proposal," *id.* at 22, by which he would sign documents prepared by ICIC relating to purchases in his name of rights in CCAH, *id.* (Aug. 8, 1996) at 355, by which he received between $500,000 and $1.8 million, *id.* (Aug. 7, 1996) at 354–55, and under which he had no actual or beneficial interest in the rights in CCAH. *E.g., id.* at 19, 54, 311. *But see* Deposition of Imran Mohammed Ahmad Imam, Civ. No. 93–1309, Jan. 28, 1998, at 1379–80 (describing agreement under which H.E. Al–Shorafa retained an actual interest in a small portion of the CCAH shares recorded in his name); First Am. Opp'n Ex. FAB/FAC 435.

■ H.E. Al–Shorafa has filed a motion for summary judgment on the ground that "[t]he mere fact that a passive shareholder in

the BCCI imbroglio can be involved in an American litigation insults our concepts of justice and fair play." Al–Shorafa Mem. at unnumbered p. 3. With all due respect, the Court cannot say that as a matter of law H.E. Al–Shorafa prevails on his "ostrich" defense. The facts — even as presented solely by H.E. Al–Shorafa on deposition — raise jury issues as to whether he was either "passive" or even actually a "shareholder" in any meaningful sense of the word. Moreover, even accepting his contention that he was a mere pawn with no knowledge of any illegal dealings, mere ignorance is not an absolute bar to RICO liability if that ignorance is willful or reckless. For largely the reasons further elaborated in First American's opposing memorandum of law, H.E. Al–Shorafa is not entitled to judgment as a matter of law because there are genuine issues of material fact that must be resolved by the jury.

### CONCLUSION

Accordingly, upon consideration of the entire record in this matter, and for the reasons stated above, it is hereby

**ORDERED** that Clifford's and Altman's Motion for Summary Judgment in Civil Action No. 93–1309 is DENIED; and it is

**FURTHER ORDERED** that First American's Motion for Partial Summary Judgment on Claims of Breach of Fiduciary Duty is DENIED; and it is

**FURTHER ORDERED** that First American's Motion for Summary Judgment on Clifford's and Altman's Indemnification Claims in Civil Action No. 95–0877 is DENIED; and it is

**FURTHER ORDERED** that Clifford's and Altman's Motion for Summary Judgment on First American's Counterclaims in Civil Action No. 95–0877 is DENIED; and it is

**FURTHER ORDERED** that H.E. Al–Shorafa's Motion for Summary Judgment in Civil Action No. 93–1309 is DENIED.

All other orders remain in full force and effect. As previously directed, the Court looks forward to meeting with counsel in Chambers at 10:00 a.m. on September 10, 1998 for the final pretrial conference. The Court trusts, and directs, that counsel will receive all necessary training to utilize the high-tech amenities of Courtroom 9 to provide for an expeditious development of the record. As previously scheduled, trial by jury shall commence on October 5, 1998 at 10:00 a.m.

IT IS SO ORDERED.